**URBAN INDUSTRIES OF OHIO, INC., Appellee,**

**v.**

**TECTUM, INC., Appellant.**

[Cite as *Urban Industries of Ohio, Inc. v. Tectum, Inc.* (1992), 81 Ohio App.3d 768.]

Court of Appeals of Ohio,
Crawford County.

No. 3–91–41.

Decided July 14, 1992.

*James L. Childress*, for appellant.

*D. Kim Murray*, for appellee.

HADLEY, Presiding Judge.

Defendant-appellant, Tectum, Inc. ("Tectum"), appeals from a judgment entry in the Crawford County Court of Common Pleas, granting a directed verdict in favor of plaintiff-appellee, Urban Industries of Ohio, Inc. ("Urban").

This action was commenced on February 1, 1990, by the filing of appellee's complaint, whereby it sought payment for lamination services performed for appellant. Appellant counterclaimed, seeking damages for two separate claims. The first claim related to a project Tectum contracted to perform in Hamden, Connecticut called the Church Street School Project ("CSS Project").

The causes of action relating to the CSS Project included breach of warranty and negligence, based upon the doctrine of *res ipsa loquitur*, for work that Urban performed for Tectum. The second claim involved three other construction projects that Tectum subcontracted to Urban to perform.

Urban agreed to perform certain work for Tectum for the CSS project in June 1989, including producing roof-deck panels. This product consists of three materials, waferboard, styrofoam, and tectum substrate, laminated in a sandwich fashion. Tectum supplied the materials for the roof-deck panels to Urban. It was also noted by the trial court during his ruling from the bench that the instructions and guidelines for applying the adhesive and compressing the materials were given by Tectum and Morton–Thiokol, the supplier of the glue.

During the lamination process, adhesive was applied to both sides of the styrofoam, the two outer products were placed on each side of the styrofoam, and then all three products were vacuum-pressed together by Urban. Tectum specified to Urban the thickness of the adhesive to the applied, the pressure of the vacuum, and that only one of two types of adhesive could be applied. Further, Urban was not to exceed the recommendation of Morton–Thiokol for "open time." [1] After the application of the vacuum pressure, Urban trimmed the roof deck panels to ensure that they were in proper alignment.[2]

During Tectum and Urban's business relationship, which began in 1988, Urban intermittently reported a quality-control problem to Tectum concerning some tectum panels supplied by Tectum. As late as April 1989, Urban complained to Tectum during a meeting of the two companies that there were problems with the surface of the tectum boards supplied to Urban for lamination. Urban stated that some of the tectum surfaces were uneven and/or concave. There was an implication at trial that this problem with the tectum surface may have resulted in problems for Urban during lamination. However, it was also stated by a Tectum representative that even if the tectum board had been uneven or warped in some manner, vacuum pressing would still have compressed the tectum into the adhesive.[3]

In June 1989, Urban received the order and materials to do the CSS project for Tectum. Within a few days, the order was completed and Urban shipped

---

1. "Open time" refers to the time that elapses between the application of the adhesive and the pressure of the vacuum.

2. This alignment process is referred to as "registering."

3. There was evidence that the styrofoam in the panels removed from the CSS project job site had pulled away from the tectum and that these two pieces were far from securely adhered to each other.

the completed roof-deck panels directly to the CSS project job site. In early February 1990, it was discovered that several of the panels had delaminated, causing a critical problem because these panels were designed to be supporting structures. Tectum made an initial inspection of the roof at the CSS project on February 20, 1990. Pursuant to this inspection, Tectum notified Urban that Urban could inspect the job site and that in the opinion of Tectum's vice-president, the delamination problem had occurred as a result of excessive open time. Tectum also informed Urban that the architect and engineer on the CSS project were demanding replacement of the delaminated panels or testing of the panels that had not failed. The evidence indicates that Urban did not make an inspection of the CSS project job site.

There was testimony at the trial that Tectum's vice-president, John Carlson, sent a letter dated May 4, 1990, to Anthony Garcia of R.V. Civitello, the general contractor for the CSS project, stating that it was Tectum's position that the delamination had occurred possibly because of improper handling of the panels during storage or moving or improper nailing during installation. There was no mention that the delamination could have resulted from excessive open time.

Due to the failure of some of the panels, the entire roof of the school had to be replaced. Urban denied liability for the delamination of the panels and, therefore, Tectum hired a subcontractor to perform the replacement work. As in its arrangement with Urban, Tectum supplied the panels to the replacement subcontractor to be laminated. There is no evidence that any of these panels supplied by the subsequent subcontractor delaminated.

The three other construction projects, which compose appellant's second claim for relief, occurred after the CSS project. These projects were the Woodland School project, the Holy Rosary School project, and the York College of Pennsylvania project. Evidence at trial indicated that Urban performed work, lamination and/or alignment, for these projects and that problems occurred with each of these three projects. However, Tectum did not notify Urban until after replacement work had been completed that there was a problem possibly relating to the work that Urban had done and that replacement had been necessary to conform the work to the contractor's requirements.

Upon completion of appellant's case in chief, appellee moved for a directed verdict against both of appellant's claims for relief. At this time during the jury trial, the trial judge concluded that he would grant the directed verdict only as to the CSS project. During appellee's case in chief, the trial judge granted a directed verdict against appellant on its second claim for relief. The October 7, 1991 judgment entry of the trial court reflected that a directed

verdict had been directed in favor of Urban. It is from this judgment entry that appellant appeals, asserting two assignments of error.

### Assignment of Error No. 1

"The trial judge erred in directing a verdict on Tectum's counterclaim for damages caused by the delamination of Tectum III roof-deck panels on the Church Street School project."

■ This assignment of error addresses the directed verdict motion as to the CSS project. Significant to this assignment of error is appellant's argument that this claim for relief is based upon *res ipsa loquitur*. This doctrine of negligence has been defined as:

" * * * a rule of evidence which permits the jury to draw an inference of negligence where the instrumentality causing the injury is under the exclusive management and control of the defendant and the accident occurs under such circumstances that in the ordinary course of events it would not occur if ordinary care were observed." (Citations omitted.) 70 Ohio Jurisprudence 3d (1986) 295–296, Negligence, Section 157.

Although appellant did not specifically state in its counterclaim that the doctrine of *res ipsa loquitur* was its basis for negligence, the facts alleged in the complaint, Tectum's evidence, Tectum's request for a jury instruction on *res ipsa loquitur*, and the trial judge's reliance upon the doctrine for the basis of granting Urban's motion for directed verdict all indicate that Tectum sufficiently pled this doctrine. See *Fink v. N.Y. Cent. RR. Co.* (1944), 144 Ohio St. 1, 28 O.O. 550, 56 N.E.2d 456, paragraph four of the syllabus.

■ Since the doctrine of *res ipsa loquitur* was used as a theory of negligence, the trial judge could not have granted appellee's motion for a directed verdict. Since *res ipsa loquitur* is a rule of evidence, it can never under any circumstances become the ground for granting a directed verdict. *Wise v. Timmons* (1992), 64 Ohio St. 3d 113, 116–117, 592 N.E.2d 840, 842–843.

"The trial court, in a jury trial, in a case which calls for the application of the rule of *res ipsa loquitur*, is without authority to declare, as a matter of law, that the inference of negligence which the jury is permitted to draw [ ] has been rebutted or destroyed by an explanation of the circumstances offered by the defendant, and such action on the part of the trial court is an invasion of the province of the jury." *Fink, supra*, paragraph three of the syllabus. See, also, *Manker v. Shaffer* (1954), 161 Ohio St. 285, 53 O.O. 171, 118 N.E.2d 641.

Since the trial judge improperly granted appellee's motion for a directed verdict in a case involving a jury trial and *res ipsa loquitur*, we sustain appellant's first assignment of error.

Assignment of Error No. 2

"The trial judge erred in directing a verdict on Tectum's counterclaim for damages caused by the out-of-register Tectum III roof deck panels on the three other school projects."

In regard to the three other construction projects that Tectum was seeking damages for, the trial court granted a directed verdict for Urban. The trial court determined that the Uniform Commercial Code, R.C. Chapters 1301 to 1309, applied to the facts. Thus, because Tectum never gave notice to Urban until after Tectum had other subcontractors perform replacement work, the trial court ruled that R.C. 1302.65 precluded Tectum from having a cause of action against Urban for breach of the contract; therefore, the trial court granted Urban's motion for a directed verdict.

In order to determine that R.C. 1302.65 applied, the trial court determined that the transaction between the parties was a "sale of goods." Tectum argues in this assignment of error that the trial court improperly applied R.C. 1302.65, because the transaction did not involve a sale of goods. "Goods," as used in R.C. Chapter 1302, is defined as follows:

"(8) 'Goods' means all things (including specially manufactured goods) which are moveable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. * * *" R.C. 1302.01(A)(8).

Certain items are not always easily identifiable as "goods" as defined in R.C. 1302.01(A)(8). This is because sometimes services become intermingled with the goods involved in a transaction. Sales of services are not covered by R.C. Chapter 1302. Thus, a problem has arisen concerning whether a transaction involves goods and is covered by R.C. Chapter 1302 or whether the transaction involves the sale of a service and is not covered by R.C. Chapter 1302.

In *Allied Indus. Serv. v. Kasle Iron & Metals, Inc.* (1977), 62 Ohio App.2d 144, 16 O.O.3d 303, 405 N.E.2d 307, the Lucas County Court of Appeals promulgated a test to determine whether R.C. Chapter 1302 applies in a "mixed transaction":

"* * * [W]e adopt the following approach developed in a case such as one before us which involves a mixed goods and services contract: the test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods

incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." *Id.* at 147, 16 O.O.3d at 305, 405 N.E.2d at 310.

Whether this is a transaction involving predominately services or predominately goods is a question of fact and the controlling factor is the intention of the parties, as derived from the contract. 81 Ohio Jurisprudence 3d (1988), Sales and Exchanges of Personal Property, Section 15. Undoubtedly, questions of fact are within the function of a jury. And when reasonable minds can reach different conclusions upon any material question of fact, the question is for the jury. *Walczesky v. Horvitz Co.* (1971), 26 Ohio St.2d 146, 150, 55 O.O.2d 277, 279, 269 N.E.2d 844, 846. Thus, if reasonable minds could reach different conclusions as to whether this was a predominately goods transaction or predominately a service transaction, the directed verdict granted by the trial court was improper.

We find that reasonable minds could reach different conclusions whether this was predominately a goods transaction or predominately a service transaction and, therefore, we reverse and remand the issue to the trial court. On remand, the trial judge should instruct the jury on the rule of law as outlined in *Allied, supra,* concerning mixed goods and services transactions. The jury is to determine whether the transactions between Urban and Tectum were predominately transactions in goods or in services.

The parties argue, respectively, that if these three other construction projects are considered mixed transactions, they clearly are predominately transactions in goods, or in services. However, the evidence is not clear that one aspect of the transactions predominates. There is evidence that some goods were furnished by Urban and that the roof-deck panels were specially made for Tectum, indicating a transaction predominately in goods. However, there is evidence that Tectum supplied the bulk of the material and that Urban's main contribution to the contract was providing the labor to laminate, indicating a transaction predominately in services. Further, the granting of the directed verdict came during the beginning of appellee's case in chief, which may indicate that not all the evidence helpful to a resolution of this issue had been presented. Therefore, since reasonable minds could reach different conclusions, the question which aspect predominates is for the trier of fact. This assignment of error is sustained.

For the above stated reasons, we reverse and remand the judgment of the trial court for proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

THOMAS F. BRYANT and SHAW, JJ., concur.