**MÉCANIQUE C.N.C., INC., Plaintiff,**

v.

**DURR ENVIRONMENTAL, INC., et al., Defendants.**

**No. 2:01–cv–1216.**

United States District Court, S.D. Ohio, Eastern Division.

Feb. 9, 2004.

James Douglas Viets, Decker, Vonau, Sybert, Lackey & Viets Co., LPA–2, Columbus, OH, Mark A. Aiello, Scott T. Seabolt, Foley & Lardner, Detroit, MI, for Plaintiff/Counter–Defendant.

Jeffrey G. Heuer, Jaffe, Raitt, Heuer & Weiss, Detroit, MI, Brian Lee Buzby, Porter, Wright, Morris & Arthur–2, Columbus, OH, for Defendants/Counter–Claimant.

### OPINION AND ORDER

MARBLEY, District Judge.

## I. INTRODUCTION

This matter is before the Court on the Motion for Partial Summary Judgment filed by Defendants Durr Environmental, Inc. ("Durr"), and Liberty Mutual Insurance Company ("Liberty Mutual").[1] Jurisdiction is proper pursuant to 28 U.S.C.

---

1. The third and final Defendant, GE Quartz, Inc., has no part in this Motion. For convenience, the Court will refer herein to moving Defendants Durr and Liberty Mutual as "Defendants."

§ 1332. For the following reasons, the Court **GRANTS** Defendants' Motion.

## II. BACKGROUND

Durr entered into a contract with Defendant GE Quartz, Inc. ("GE"), to engineer, design, construct, manufacture, assemble, install, start up, and test a Selective Catalytic Reduction ("SCR") System at GE's plant in Hebron, Ohio (the "Job Site"). The SCR System is used to control the emission of nitrogen oxides into the atmosphere, subject to certain permits and state and federal environmental regulations.

Plaintiff, Mécanique C.N.C., Inc. ("CNC"), was one of Durr's subcontractors on the project. Negotiations for CNC to fabricate and install ductwork and related equipment for the SCR System began in July 2000. The negotiations occurred via telephone, facsimile, and email between Durr's offices in Wixom, Michigan, and CNC's offices in Varennes, Quebec, Canada. The work was to consist of the fabrication, coating, insulation, and installation of metal and stainless steel in connection with the SCR System.

Pursuant to CNC's version of the contract formation, on August 3, 2000, CNC submitted a bid to Durr outlining the work and price (the "August 3, 2000, Letter").[2] Durr then submitted to CNC an executed proposed subcontract agreement (the "Subcontract"), labeled "Subcontract No. 82410.22336.SC" and dated August 2, 2000.[3] The Subcontract referenced certain "Contract Documents," but the documents were not attached. Thereafter, CNC added three handwritten notes to the Subcon-

tract, signed it, and forwarded it to Durr. The first handwritten note attempted to add to the "Contract Documents" section of the Subcontract the August 3, 2000, Letter. The second handwritten addition attempted to shift the obligation to supply tools from CNC to Durr. The third addition attempted to change the "Payment Terms" from "Subcontractor to Invoice monthly based on percentage of material delivered and installed at jobsite" to "Subcontractor to Invoice monthly based on material purchased and received in our shop."

Following receipt of the executed Subcontract with the handwritten additions, Rob Cox, an employee of Durr, sent CNC a revised Subcontract on both August 4, 2000, and August 9, 2000. This revised Subcontract included the substance of CNC's additions regarding invoicing but did not include the other two proposed changes. CNC never executed either copy of the revised Subcontract. In a letter dated October 30, 2000, Cox informed CNC that the "alterations" made the Subcontract "null and void." [4]

Both parties commenced and continued performance without regard to the dispute over the contract. CNC began fabrication in August 2000 at its facilities in Montreal. CNC also coated some of the fabricated work in Montreal. CNC acknowledges that this work was performed in accordance with directions from Durr and GE. While the work was being performed, two "kick off" meetings occurred. One occurred at Durr's facility in Wixom, Michigan, and the other at the Job Site. Subse-

---

2. Durr notes that the August 3, 2000, Letter specifically references "DE Job Number 22336," Durr's job number for the GE project, found on the Subcontract. It also specifically references the "Subcontractors General Conditions" without objection or exception and contains the same price term as found in the Subcontract.

3. Durr asserts that it sent the Subcontract to CNC on August 2, 2000, and that CNC only subsequently sent the August 3, 2000, Letter.

4. Defendants explain this letter as an attempt by Cox, a non-lawyer, to obtain a clean, signed copy of the Subcontract.

quently, representatives of both Durr and GE traveled to Montreal to inspect the fabrication and coating work being performed by CNC. During this time period, CNC corresponded with Durr, obtained surety bonds, and requested and received payment, all referencing the Subcontract and/or the Subcontract number. In a letter from CNC to Durr dated March 9, 2001, CNC also apparently referenced the Subcontract.[5]

In approximately September 2000, CNC commenced delivery of the fabrication work to the Job Site. CNC also began assembly of the fabricated steel, which was inspected at the Job Site by representatives of both Durr and GE. Localized problems with certain coating were then ascertained at the Job Site. CNC received new procedures from Durr at that time, and CNC commenced refinishing certain fabrication on site in Hebron. This re-work conducted at the Job Site caused certain delays and substantial additional costs to CNC. The parties have both factual and legal disputes relating to the re-work and to subsequent actions taken by the parties, as well as justifications for those actions. According to CNC, Durr later unilaterally amended the work schedule and imposed an arbitrary deadline on CNC. Notwithstanding, CNC was on schedule to complete the work within the given time. Prior to the deadline, however, in March 2001 CNC was terminated. Durr claimed to be unhappy with the progress of the work; however, CNC believes it was terminated because it had demanded compensation for its damages resulting from, among other things, the re-work. After CNC's termination, Durr directly contracted with one of CNC's subcontractors to complete the work.

On December 7, 2001, CNC brought suit against Durr, Liberty Mutual,[6] and GE. In its Complaint, CNC alleges the following causes of action against Durr: (1) breach of contract; (2) delay, inefficiency, and increased overhead damages; (3) violation of section 4113.61 of the Ohio Revised Code; (4) quantum meruit and unjust enrichment; (5) wrongful termination and nonperformance; (6) cardinal change and contract modification; and (7) breach of duty of good faith and fair dealing. CNC seeks to recover from Liberty Mutual based on breach of payment bond. CNC alleges a cause of action against GE for quantum meruit and unjust enrichment. In an additional Count of its Complaint, CNC seeks foreclosure of a mechanics' lien.

This matter is before the Court on Defendants Durr and Liberty Mutual's Motion for Partial Summary Judgment. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendants ask this Court to hold that the governing contract between Durr and CNC was the Subcontract, rather than, as Plaintiff contends, the August 3, 2000, Letter.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The movant has the

---

**5.** The subject line of the letter reads, "Termination of Subcontract Agreement," and the letter states, "[W]e reserve all rights to claim damages pertaining to the termination of this subcontract agreement." The letter was apparently sent in response to Durr's letter of the same date, which referenced the Subcon-

tract and confirmed Durr's intent to terminate the Subcontract.

**6.** The claims against Liberty Mutual are based on Liberty Mutual's position as surety for both payment and performance bonds provided by Durr to GE.

burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). The non-moving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir.1993) (citations omitted).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The Court must also interpret all reasonable inferences in the non-movant's favor. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing the evidence). The existence of a mere scintilla of evidence in support of the non-moving party's position will not be sufficient, however; there must be evidence from which the jury could reasonably find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (finding summary judgment appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party").

## IV. ANALYSIS

### A. Choice of Law

The Subcontract states that it is to be governed by Michigan law. Defendants contend that since the Subcontract is the governing agreement between Durr and CNC, Michigan law applies here. CNC asserts that Ohio law controls. In response to CNC's arguments, Defendants state that the outcome is the same whether Michigan or Ohio law applies.

 A federal court exercising diversity jurisdiction is required to apply the choice of law rules of the state in which it sits. *E.g., Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822, 824 (6th Cir. 1996) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Under Ohio law, before engaging in any choice of law analysis, a court must first determine whether such analysis is necessary. *Akro–Plastics v. Drake Indus.*, 115 Ohio App.3d 221, 685 N.E.2d 246, 248 (1996); *accord McDonald v. Williamson*, No. 81590, 2003 WL 22922271, at *2 (Ohio App. Dec. 11, 2003). If the two states would use the same rule of law or would otherwise reach the same result, it is unnecessary to make a choice of law determination because there is no conflict of law. *Akro–Plastics* at 248 (citing, *inter alia*, Restatement (Second) of Conflict of Laws § 1 cmt. b (1971)). Where the party seeking application of the law of a foreign jurisdiction fails to demonstrate a conflict between local law and the law of that jurisdiction, local law—here Ohio law—governs. *Gouge v. BAX Global, Inc.*, 252 F.Supp.2d 509, 521 (N.D.Ohio 2003) (citing *Cross v. Carnes*, 132 Ohio App.3d 157, 724 N.E.2d 828, 836 (Ohio App. 1998), *Akro–Plastics*, 685 N.E.2d at 248, and *Avenell v. Westinghouse Elec. Corp.*, 41 Ohio App.2d 150, 324 N.E.2d 583, 586 n. 3 (Ohio App. 1974)).

Here, Defendants have conceded that there is no conflict between the laws of Michigan and Ohio for purposes of this Motion. Furthermore, the Court has found no indication that it would reach a different result under Michigan law. The Court, therefore, will not conduct a choice of law analysis at this juncture but will apply Ohio law in deciding this Motion.

## B. Applicability of the Uniform Commercial Code

Ohio has adopted the applicable provisions of the Uniform Commercial Code ("UCC"). *See* Ohio Rev.Code §§ 1301.02 et seq. Article 2 of the UCC, sections 1302.01 to 1302.98 of the Ohio Revised Code, applies only to "transactions in goods."[7] Ohio Rev.Code § 1302.02. Defendants contend that Article 2 applies here because the contract between Durr and CNC was predominantly a contract for the sale of goods. Plaintiff, on the other hand, asserts that the agreement was primarily a services contract.

While the Ohio Supreme Court has not spoken on the matter, all Ohio appellate courts to have considered the applicability of the UCC to mixed contracts for goods and services have adopted a predominant factor test. *See, e.g., Delorise Brown, M.D., Inc. v. Allio,* 86 Ohio App.3d 359, 620 N.E.2d 1020, 1021–22 (Ohio App. 1993); *Urban Indus. of Ohio, Inc. v. Tectum, Inc.,* 81 Ohio App.3d 768, 612 N.E.2d 382, 385–86 (Ohio App. 1992); *Allied Erecting & Dismantling Co. v. Auto Baling Co.,* 69 Ohio App.3d 502, 591 N.E.2d 259, 263 (Ohio App. 1990). The test was first promulgated in *Allied Industrial Service Corp. v. Kasle Iron & Metals, Inc.,* 62

Ohio App.2d 144, 405 N.E.2d 307 (Ohio App. 1977):

> [W]e adopt the following approach developed in a case such as the one before us which involves a mixed goods and services contract: the test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved.

405 N.E.2d at 310 (holding that plaintiff "was selling its services in the design and installation of a pollution control system, and that the goods ordered and installed, i.e. the particular filters, ductwork, hood, etc. were incidental to the labor"). The burden of proof in the case of a mixed contract is on the party who asserts that the contract is governed by the UCC. *Renaissance Techs., Inc. v. Speaker Components, Inc.,* No. 21183, 2003 WL 118509, at *1 (Ohio App. Jan. 15, 2003) (citing *Eaton Corp. v. Taylor–Winfield Corp.,* No. 62361, 1993 WL 267113, at *2 (Ohio App. July 15, 1993)).

Whether a transaction predominantly involves goods or services is ordinarily a question of fact for the jury. *Urban Indus.,* 612 N.E.2d at 386; *see Busch v. Dyno Nobel, Inc.,* 40 Fed.Appx. 947, 953 (6th Cir.2002) (citing *Higgins v. Lauritzen,* 209 Mich.App. 266, 530 N.W.2d 171, 173 (1995)). A jury, however, should only resolve this issue if there is a true factual dispute, not if the division between goods and services merely involves a close call. *Valleaire Golf Club, Inc. v. Conrad,* No.

7. The term "goods" is defined as follows:

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 1302.03 of the Revised Code.

Ohio Rev.Code § 1302.01(8).

03CA0006–M, 2003 WL 22900451, at *1–2 (Ohio App. Dec. 10, 2003) (noting that where "there are no disputed facts that raise issues to be decided by the jury, it is proper for the trial court to rule as a matter of law on whether the contract is covered by Article Two") (emphasis removed) (quoting *Wooster Prods., Inc. v. Magna–Tek, Inc.,* No. 2462, 1990 WL 51973, at *5 (Ohio App. April 25, 1990)); *see also Busch,* 40 Fed.Appx. at 953, 2002 WL 1608340, at *6 ("[W]here there is no genuine issue of any material fact regarding the provision of the contract, a court may decide the issue as a matter of law.") (citing *Higgins,* 530 N.W.2d at 173). In *Valleaire,* the trial judge specifically asked plaintiff's counsel what facts were disputed, and counsel was able to point to none, asserting, instead, that the determination of the predominant purpose of the contract was a "close call" that should be decided by the jury. *Valleaire,* 2003 WL 22900451, at *2. The Court of Appeals held, "Because Valleaire did not demonstrate to the trial court that there were disputed facts regarding the predominant purpose of this contract, it failed to demonstrate to the trial court that this was a jury issue." *Id.*

Here, as in *Valleaire,* Plaintiff could point to no disputed facts that are relevant to the issue of whether this contract was primarily for goods or services. The parties might disagree as to the ultimate conclusion that this Court should reach based on the facts, but there appears to be no genuine dispute as to what the facts are. For example, the parties seem to agree as to what work the contract did and did not call for, as to what work was actually done, and as to where that work was performed and what it involved. The only dispute seems to relate to the legal consequences of these facts. Absent a genuine dispute

as to any material fact, it is the function of the Court to apply the law to the facts.

■ The Court concludes that the contract here was predominantly for the sale of goods, with services only incidentally involved. As noted by the Michigan Supreme Court, virtually all commercial goods involve some type of service, "whether design, assembly, installation, or manufacture." *Neibarger v. Universal Coops.,* 439 Mich. 512, 486 N.W.2d 612, 622 (1992). Plaintiff's primary argument—that it devoted significant time and effort, both on and off of the Job Site, to providing fabrication and coating, as well as installation, services—thus is similar to an argument that could be made by virtually any manufacturer. Such an argument, of course, does not transform every contract for goods into a contract for services. The mere fact that a manufacturer utilizes its effort and expertise in producing a good does not mean that the buyer is purchasing those services instead of the good itself. The question is whether the purchaser's ultimate goal is to acquire a product or procure a service. *Id.* At oral argument, Plaintiff's counsel conceded that, "at the end of the day," the purchaser's predominant purpose was to acquire an "operating good." The Court agrees. The installation service provided by Plaintiff, though extensive, was merely incidental to Durr's purpose of procuring the necessary ductwork.[8]

This case is significantly different than those cases in which courts have found a mixed contract to be primarily for the sale of services. *See, e.g., Heidtman Steel Prods., Inc. v. Compuware Corp.,* No. 3:97CV7389, 2000 WL 621144 (N.D.Ohio Feb. 15, 2000) (holding the contract to be for services where the defendant was a software consultant paid by the hour for work in designing and implementing an

---

**8.** Likewise, the fact that much of the work to prepare the ductwork occurred on the Job

Site is not particularly relevant in determining the purpose of the contract.

effective computer system); *Home Ins. Co. v. Detroit Fire Extinguisher Co.*, 212 Mich.App. 522, 538 N.W.2d 424, 427–28 (1995) (finding that the contract in question "calls for the design and installation of a *unique* system and contemplates regular servicing and testing of the system after installation") (emphasis in original); *Allied Indus.*, 405 N.E.2d at 309 (noting that "Allied's business was to design, install and service pollution control systems"). *Heidtman* is especially instructive. There, even though the plaintiff's ultimate goal was to obtain an operational computer system well tailored to its business, the contract was for services because the defendant did far more than sell software to the plaintiff. The defendant was charged with tasks such as "develop[ing] a set of requirements for each of the individual application areas," "recommend[ing] configuration and architecture for the new application system," and "install[ing] and support[ing] the Oracle software (purchased by plaintiff from a different vendor)." *Heidtman*, 2000 WL 621144, at *7. As far as the software itself, the defendant's "primary role was to implement the Oracle applications into the production environment, which is a service." *Id.* at *8. The Court also found persuasive the fact that the defendant's "remuneration was not tied at all to the provision of goods." *Id.* Rather than paying separately for each piece of customized software created by the defendant's employees, the plaintiff paid an hourly rate for the defendant's services.

Here, Plaintiff's compensation was tied to the goods produced rather than the labor provided.[9] There was no separate price for installation. Though the good produced was a unique product created in accordance with specifications, CNC played no role in the design of the product. Even more significantly, the parties did not contemplate that CNC would be involved in any ongoing servicing or testing of the ductwork once it was installed. CNC's job was to provide a product in accordance with certain specifications. Once that product was created and installed, CNC had no further role. Durr's contract with GE might have been a contract for the provision of services, since Durr was involved in the design of the system and in coordinating the various pieces. What Durr sought to obtain from CNC, however, was primarily a good, with installation services being incidental.

For the foregoing reasons, Defendants have established that the UCC applies to the transaction between Durr and CNC.

## C. The Governing Contract

According to UCC § 2–204(1), "[a] contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Ohio Rev.Code § 1302.07(A); *Am. Bronze Corp. v. Streamway Prods.*, 8 Ohio App.3d 223, 456 N.E.2d 1295, 1299–1300 (1982) (recognizing that the statute provides a liberal definition of contract formation). Here, it is clear, based on the parties' conduct as well as their writings, that there was a contract between Durr and CNC.[10] Durr and CNC agree as to many

---

**9.** One of the contract terms disputed by the parties involved Plaintiff's invoicing; however, under either version, payment is tied to "material" rather than labor or services.

**10.** Plaintiff seems to argue, even though it performed pursuant to a contract and even though it claims damages for breach of contract in its Complaint, that there was no con-

tract (or, at least, that the Subcontract does not govern) because of Rob Cox's letter stating that the Subcontract is "null and void." According to section 1302.10(C) of the Ohio Revised Code,

> [c]onduct by both parties that recognizes the existence of a contract is sufficient to establish a contract for sale although the

of the terms of the contract, including the contract price and the specifications of the work to be done. This Court, however, must resolve the remaining contract terms.

■ A valid and binding contract comes into existence when an offer is accepted. *Realty Dev., Inc. v. Kosydar*, 322 N.E.2d 328, 332 (Ohio Ct.App.1974); *see Noroski v. Fallet*, 2 Ohio St.3d 77, 442 N.E.2d 1302, 1304 (1982). The first question for this Court, then, is what constituted the offer.[11] While Plaintiff might argue that the August 3, 2000, Letter was an offer, a price quotation is generally considered to be merely an invitation for an offer, rather than an offer to form a binding contract. *Dyno Constr. Co. v. McWane, Inc.*, 198 F.3d 567, 572 (6th Cir. 1999) (citing *White Consol. Indus., Inc. v. McGill Mfg. Co.*, 165 F.3d 1185, 1190 (8th Cir.1999) and *Realty Dev.*, 322 N.E.2d at 332); *accord L.B. Trucking Co., Inc. v. C.J. Mahan Constr. Co.*, No. 01AP–1240, 2002 WL 1969645, at *4 (Ohio App. Aug. 27, 2002).

This case is similar to *Interstate Industries, Inc. v. Barclay Industries, Inc.*, 540 F.2d 868 (7th Cir.1976), relied upon in *Dyno*. In *Interstate Industries*, the court determined that a letter sent by the defendant to the plaintiff stating that the defendant would be able to manufacture fiberglass panels for the plaintiff pursuant to specified standards at certain prices did not constitute an offer. The court found

that the letter's use of the term "price quotation," the lack of language indicating that an offer was being made, and the absence of terms regarding quantity, time of delivery, or payment established that the letter was not intended as an offer. *Id.* at 873; *see also Dyno*, 198 F.3d at 574 (noting that although the price lists in question set forth descriptions of the materials, prices, and quantities, nothing was stated about the place of delivery, time of performance, or terms of payment). While the question of whether a communication is an offer is generally one of intent that should be determined by a jury, the court may, in certain circumstances, make the determination as a matter of law. *Dyno* at 572–73 (holding that the facts furnished a sufficient basis for the district court to conclude as a matter of law when the contract was formed).

■ The August 3, 2000, Letter states that it contains "the details of our quotation." The letter references the specifications, describes the work to be performed and goods to be provided, details the basis for the quotation, and quotes a price of $1.1 million. The letter closes with the statement, "Hoping the above meets your entire satisfaction...." On its face, the August 3, 2000, Letter is a price quotation that is no more than an invitation for an offer. It contains no language suggesting that it is an offer. It also contains few, if any, details of an agreement between the

writings of the parties do not otherwise establish a contract. In such case, the terms of the particular contract consist of those terms on which the writings of the parties agree, together with any supplementary terms incorporated under any other provisions ... of the Revised Code.
As noted in the text, there is ample evidence that both parties recognized the existence of a contract. Following Cox's October 30, 2000, letter, both parties continued to perform under the contract as they understood it. The Court is not persuaded that Cox's letter had

any legal effect. It did not purport to change the terms of the contract, and the contract obviously did not cease to exist.

11. In Ohio, an offer is defined as a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." *Leaseway Distribution Ctrs., Inc. v. Dep't of Admin. Services,* 49 Ohio App.3d 99, 550 N.E.2d 955, 961 (1988) (quoting Restatement (Second) of Contracts § 24 (1981)).

parties. For example, the letter does not mention timing of performance or terms of payment. The closing statement suggests that the letter is merely one step in an ongoing negotiation process. The offer in this case, then, was not the August 3, 2000, Letter, but the Subcontract that was signed by Durr and submitted to CNC.

■ The next question relates to acceptance of the offer. Pursuant to UCC § 2–207, section 1302.10 of the Ohio Revised Code, a contract formed immediately upon CNC's acceptance of the Subcontract, even with the inclusion of additional terms. Section 1302.10(A) states,

> [a] definite and seasonable expression of acceptance or a written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms.

Furthermore, pursuant to section 1302.10(B),

> [t]he additional terms are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless one of the following applies:
> (a) The offer expressly limits acceptance to the terms of the offer.
> (b) They materially alter it.
> (c) Notification of objection to them has already been given or is given within a reasonable time after notice of them is received.

CNC tendered a "definite and seasonable expression of acceptance" by signing the Subcontract and returning it to Durr. A binding contract was formed at that point. When it signed the Subcontract, CNC proposed three additional terms for consideration: (1) that the August 3, 2000, Letter be added to the list of "Contract Documents"; (2) that the obligation to supply tools be shifted from CNC to Durr; and (3) that CNC invoice Durr based on material purchased and received in its shop rather than material delivered and installed at the Job Site. CNC did not include any statement making its assent conditional on the additional terms. The three additional terms thus did not invalidate the Subcontract; rather, they were proposals that would only be enforceable if Durr failed to object to them.[12] Through a revised Subcontract sent to CNC on August 4 and August 9, 2000, Durr accepted the third proposed term (regarding invoicing) but implicitly rejected the other two additional terms.

The governing contract between Durr and CNC therefore is Subcontract No. 82410.22336.SC, which was signed by both Durr and CNC. The terms of the contract include the one handwritten term that Durr accepted but do not include the two handwritten proposals that Durr rejected.

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendants Durr Environmental, Inc., and Liberty Mutual Insurance Company's Motion for Partial Summary Judgment.

**IT IS SO ORDERED.**

---

12. There is no evidence that the offer explicitly limited acceptance to the terms of the offer or that any of the three proposed additional terms materially altered the agreement.