NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0979n.06

No. 10-4143

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Sep 05, 2012*
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| CRANPARK, INC., an Ohio Corporation, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| ROGERS GROUP, INC., an Indiana Corporation, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |

Before: COOK, WHITE, and DONALD, Circuit Judges.

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Cranpark, Inc. (Cranpark), appeals the district court's grant of summary judgment in favor of Defendant-Appellee Rogers Group, Inc. (RGI), on its breach of contract and promissory estoppel claims. We reverse.

**I.**

In 1977, James Sabatine founded an asphalt paving company, Hardrives Paving and Construction, Inc. (Hardrives), in Mineral Ridge, Ohio, just east of Youngstown. Defendant RGI, founded over 100 years ago, is a crushed-stone producer and distributor with four facilities in Northeast Ohio – a quarry in Sandusky and distribution terminals in Akron, Macedonia, and Masillon. The distribution terminals in Akron and Masillon have rail-to-truck service, which allows

1

construction aggregate to be transported to the facilities from Sandusky by rail. In contrast, during the events underlying this litigation, Macedonia had only truck-to-truck service, which necessitated the more expensive process of transporting aggregate from Sandudsky via truck. In the 1990s, the main supplier of aggregate in Youngstown decided to discontinue this product, and RGI hoped to step in and fill the resulting void. To accomplish this, RGI contemplated a joint project with a local partner who could, among other things, facilitate rail access, share development of logistics and costs, coordinate local development and zoning, and be a RGI customer. RGI identified Hardrives as a potential partner and, in March 1998, RGI salesman Tom Stump (Stump) had a preliminary meeting with Sabatine to discuss these plans. Following this initial meeting, Stump, Sabatine, and RGI Vice President Greg Gould (Gould) engaged in planning and negotiations regarding this project for six months. Cranpark claims that subject to certain contingencies, the parties agreed to jointly establish a facility in Youngstown that would house both a new asphalt plant for Hardrives and a distribution terminal for RGI.

In order for RGI to commit to the project, it required low-cost rail access from Sandusky to Youngstown and land at no cost on which to build and operate a distribution terminal. The parties jointly met with representatives from Norfolk Southern to discuss rail access. On June 3, 1998, the parties located two potential sites for the distribution terminal, the Ohio Works site and the Center Street site.

On September 1, 1998, Gould and Sabatine memorialized certain terms on a single handwritten sheet of notebook paper. At the top of the sheet are the words: "This Agreement is between Hardrives Paving & Const Inc and the Rodgers Group." The writing lists prices for specific

types of aggregate, along with additional terms, including a minimum purchase requirement of 210k tons of aggregate to obtain the listed prices, rail transport at $4.00 or less, .50 cent royalty on all non-Hardrives sales, free land, a five-year minimum tax abatement, and no improvement to rail required. The writing also states, between the pricing terms and the royalty provision, "SJCT. TO RGI SR. MGT. APPROVAL." At the bottom of the sheet are Gould and Sabatine's initials and the date. The writing is reproduced in its entirety below:



According to Cranpark, Hardrives and RGI continued to work together after the September 1, 1998 writing to fulfill the terms contained therein. Sabatine obtained approval from the City of Youngstown to use the Center Street site on November 5, 1998, and Hardrives executed a license

3

agreement with the City of Youngstown to use that land for $1.00 per year in April 1999, which Hardrives agreed to pay to fulfill the "free land" term in the September 1, 1998 writing. On November 30, 1998, Norfolk Southern agreed to a total rail rate of $3.98 per ton, which fulfilled the $4.00 or less rail term.

Cranpark asserts that after obtaining commitments from the City of Youngstown and Norfolk Southern Rail, Hardrives was ready to purchase an asphalt plant for the joint project. Sabatine called RGI to make sure that everything was in order and he should go forward; Sabatine claims someone from RGI told him that everything was in order, a formal contract was on its way, and he should buy the plant. Hardrives then purchased a new plant for $1,500,000.00 and began placing bids on new paving jobs based on the prices listed in the September writing.

In February of 1999, Stump met with Sabatine and informed him that RGI was walking away from the project. Sabatine demanded that RGI honor the aggregate prices listed in the September writing but RGI refused. Cranpark asserts that RGI breached the contract because after Sabatine obtained the reduced rail prices to Youngstown, RGI successfully negotiated with Norfolk Southern to obtain rail access to its distribution terminal in Macedonia and thereafter lost interest in building a new terminal in Youngstown.

Without the ability to obtain aggregate at the prices stated in the agreement, Hardrives went out of business. Hardrives's successor, Cranpark, Inc., filed suit against RGI on September 8, 2004, asserting claims of breach of contract and promissory estoppel.

On February 8, 2010, RGI moved for summary judgment, primarily on the ground that the September 1, 1998 writing reflected preliminary discussions rather than a contract and thus was

4

unenforceable. The magistrate judge[1] issued an opinion on June 2, 2010, that determined there was a genuine issue of material fact regarding whether the writing was a contract but that the predominant purpose of the writing was the sale of aggregate, and therefore a breach-of-contract claim based on that writing was governed by the four-year statute of limitations in the Ohio Commercial Code (OCC), which expired before Cranpark filed suit. The magistrate judge also granted summary judgment on the promissory estoppel claim, on the grounds that the RGI representation Sabatine claims to have relied on was not a clear and unambiguous promise upon which Hardrives could reasonably rely, the September 1, 1998 writing was not an enforceable promise, and the OCC's statute of limitations had expired for any claim based on the September 1, 1998 writing. Cranpark filed a motion for reconsideration on June 30, 2010, which the magistrate judge denied on August 9, 2010.

## II.

This court reviews a district court's grant or denial of summary judgment, and the denial of reconsideration of that decision, *de novo. Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999). The moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] party seeking summary judgment always bears the initial responsibility of informing the [court] of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v.*

---

[1]The parties consented to magistrate-judge jurisdiction for all proceedings.

*Catrett*, 477 U.S. 317, 323 (1986). In addition, all evidence must be viewed in the light most favorable to the non-moving party, and all reasonable inferences must be drawn in the non-movant's favor. *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006).

## III.

We must first determine whether the magistrate judge erred in finding that the predominant-purpose of the September 1, 1998 writing was the sale of aggregate from RGI to Hardrives. Cranpark concedes that if the magistrate judge properly found that sale of aggregate is the predominant purpose of the writing, its claims are barred by the OCC's four-year statute of limitations.[2]

## A.

The Ohio Court of Appeals first instituted the "predominant-purpose" test in *Allied Industrial Service Corp. v. Kasle Iron & Metals, Inc.*, 405 N.E.2d 307 (Ohio Ct. App. 1977). In *Allied*, defendant Kasle Iron & Metals, Inc. (Kasle) hired Allied Industrial Service Corporation (Allied) to design a system that would control pollutants emitted from Kasle. As part of the contract, Allied purchased certain equipment to use in the system it designed. When the system did not work to Kasle's satisfaction, it terminated Allied and hired another company to complete the task. Allied subsequently sued Kasle to receive payment for services rendered. The trial court found in Allied's favor, in part because no warranty existed that guaranteed the performance of Allied's system. On appeal, Kasle argued that Allied's system carried an implied warranty of fitness and merchantability

---

[2]Under Ohio Revised Code § 1302.98, "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." R.C. § 1302.98(A). The statute of limitation for non-sales written contracts is fifteen years. R.C. § 2305.06.

because Allied was a merchant pursuant to Ohio R.C. Chapter 1302. The appellate court determined that R.C. Chapter 1302 only applied to transactions in goods. After finding that the contract between Kasle and Allied was for both the sale of goods and services, the court announced that "the test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." *Id.* at 310. Under that test, the court determined the parties contracted predominantly for Allied's services in designing and installing the system, and the goods ordered and installed were only incidental to that labor.

**B.**

In determining the predominant purpose of a contract, Ohio courts may consider extrinsic evidence. In *Renaissance Technologies, Inc. v. Speaker Components, Inc.*, the Ohio Court of Appeals stated:

> The burden of proving that a contract was primarily for the purchase or sale of goods is on the party who asserts that the contract is governed by R.C. 1302 . . .This is a factual question and is to be determined by a review of the contractual language and the circumstances surrounding the contract formation and expected performance.

No. 21183, 2003 WL 118509, at *1 (Ohio Ct. App. Jan. 15, 2003).

Cranpark argues that upon consideration of all the surrounding circumstances, it cannot be said, as a matter of law, that the predominant purpose of the September 1, 1998 writing is for the sale of goods; rather, the surrounding circumstances support that the writing's predominant purpose is "to establish a Hardrives-RGI joint distribution yard and asphalt plant in Youngstown, Ohio."

The magistrate judge disagreed, finding that even if the parties planned to build a joint facility, that intent was not reflected in the September 1, 1998 writing. The magistrate judge also

7

found that the other terms in the writing were "far too sparse and ambiguous to . . . support a finding that a meeting of the minds on anything more than a sale of goods occurred." In so finding, the magistrate judge referenced Sabatine's deposition where he acknowledged that RGI's performance under the September 1, 1998 writing was contingent upon RGI acquiring free land and a five-year minimum tax abatement, and not having to install any rail improvements.

Relying on *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, in which a federal district court sitting in Ohio stated that although "[w]hether a transaction predominantly involves goods or services is ordinarily a question of fact for the jury" the jury "should only resolve this issue if there is a true factual dispute, not if the division between goods and services merely involves a close call," 304 F. Supp. 2d 971, 976 (S.D. Ohio 2004), the magistrate judge rejected Cranpark's contention that the predominant-purpose of the September 1, 1998 writing is a factual issue to be decided by the jury. The magistrate judge concluded there were no disputed facts relevant to the predominant-purpose issue because "[e]ven if the instant agreement arguably involved a real estate provision, it is obvious that the purpose of the 'Free land' provision was to permit the sale of aggregate to Plaintiff."

We disagree with the magistrate judge's conclusion that there are no material facts in dispute. At a minimum, there is one material fact in dispute - - whether RGI and Hardrives agreed to build a joint distribution terminal/asphalt plant in Youngstown provided the conditions expressed in the September 1, 1998 writing could be satisfied. RGI contends that because each entity was independently responsible for building its respective facility, the writing could not reflect the parties' intent to build a joint facility and merely contains terms that had to occur to enable RGI to supply

aggregate to Hardrives. Yet, viewing the facts in the light most favorable to Cranpark, the purpose of the September 1, 1998 writing was to memorialize certain aspects of the RGI/Hardrives undertaking, which included both companies building their respective facilities on jointly selected free land with railroad access that would allow RGI to service Hardrives and unrelated third parties, the sale of aggregate from RGI to Hardrives at reduced prices, and providing a royalty to Hardrives on non-Hardrives sales. Any conditions, or promises, in the writing then would not simply be prerequisites to RGI selling aggregate to Hardrives, but also for the parties to complete their joint facility.

According to the record, Hardrives did not approach RGI because it wanted to purchase aggregate. Nor did Hardrives propose that RGI open a terminal in Youngstown to facilitate cheaper access to RGI's product. Rather, RGI contemplated opening a new terminal in Youngstown so it could supply aggregate to that region. To achieve that goal, RGI sought out Hardrives to both provide logistics assistance in opening a new facility and purchase product from that facility.

Contrary to the magistrate judge's conclusion, the fact that the September 1, 1998 writing does not explicitly reference a joint facility does not preclude a finding that creating such a facility was the predominant-purpose of the writing. Gould admitted in his deposition that RGI wanted a low-risk, low capital project and therefore wanted "to have free land, a tax abatement for five years, not pay for any capital improvements for rail access . . . have a locked in price for railing in the aggregate . . . [and] multiyear pricing for Hardrives." These terms are all included in the September

9

1, 1998 writing. Accordingly, the grant of summary judgment to RGI on Hardrives's breach of contract claim must be reversed.[3]

## C.

RGI also briefly argues on appeal that summary judgment in its favor should be upheld on the alternative basis that there could not have been a meeting of the minds to form a contract because the RGI senior management approval condition was never satisfied. However, as the magistrate judge pointed out, it is unclear to which term or terms the approval language applied. Further there is a genuine issue whether RGI gave the required approval before telling Sabatine to go forward, and if not, whether it exercised the requisite good faith to fulfill that condition.

## IV.

We next turn to Cranpark's promissory-estoppel claim, which is based on the alleged oral representation from an RGI representative to Sabatine that everything was in order with the project between Hardrives and RGI, a formal writing would be forthcoming, and Sabatine should purchase the asphalt plant. Cranpark contends Hardrives purchased the plant in reliance on this representation.

Under Ohio law, to prevail on a promissory estoppel claim the plaintiff must demonstrate: 1) a clear and unambiguous promise; 2) reliance upon the promise; 3) reliance that is both reasonable

---

[3]We are not persuaded otherwise by the fact that Cranpark's main complaint is Hardrives's inability to obtain the aggregate at the prices listed in the September 1, 1998 writing. This is the damage Hardrives asserts it experienced as the consequence of RGI's decision to abandon the alleged joint undertaking.

and foreseeable; 4) injury as a result of the reliance. *Current Source, Inc. v. Elyria City Sch. Dist.*, 813 N.E.2d 730, 737 (Ohio Ct. App. 2004).

With respect to its promissory estoppel claim, the only evidence that Cranpark submitted in its opposition to RGI's summary judgment motion regarding the RGI representation is Sabatine's deposition testimony recounting his conversation with an RGI representative[4] and Stump's deposition testimony that he delivered large sample bags of aggregate to Sabatine. Cranpark claims that Stump's delivery is evidence of RGI acting in conformity with its promise to establish a joint facility with Hardrives.

In its reply brief below, RGI did not challenge the factual accuracy of Sabatine's deposition testimony. Instead, RGI argued that the testimony was not sufficient evidence under Fed. R. Civ. P. 56(e) to survive RGI's motion for summary judgment.

---

[4]Sabatine's deposition testimony states:

> And before, you know, I ordered the asphalt plant, I'll never forget, I wanted an agreement in writing from them. And I called them up on the phone; they said it was forthcoming, but go ahead, you know, buy the plant, which I did. And then to top it off, the whole winter I had three or four laboratory people testing aggregates for the airport project. And they delivered all the materials that they were going to be railing in to me in bags, and we tested their material. Nobody else's. Material coming from, I think it was coming from Sandusky, Ohio. Tested the material, made, designed all the job mixes for the airport job with Rogers' mixes that they were going to rail in to me.

The magistrate judge determined that Sabatine's inability to specifically identify the RGI individual who made the December 1998 representation, combined with the fact that his deposition testimony was self-serving, did not create a genuine issue of material fact.[5]

The Ohio Court of Appeals defines promise as "a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." *HAD Enters. v. Galloway*, 948 N.E.2d 473, 481 (Ohio Ct. App. 2011). Although "the party who asserts the promissory-estoppel claim bears the burden of proving by clear and convincing evidence all the elements of the claim . . . [w]hether appellee made 'a clear and unambiguous promise' is a question of fact." *Id.*

The magistrate judge did not address whether there is a genuine dispute as to a material fact regarding whether RGI's alleged oral representations to Sabatine constitute a clear, unambiguous promise nor whether Hardrives's reliance on this specific representation was reasonable. Instead, the magistrate judge determined summary judgment was proper because Sabatine's "self-serving" deposition testimony could not establish a genuine issue of fact. However, a plaintiff's deposition testimony submitted in response to a summary judgment motion may be sufficient to create a genuine issue of material fact. *Harris v. J.B. Robinson Jewelers*, 627 F.3d 235, 239 (6th Cir. 2010).

---

[5]The magistrate judge also found Cranpark's promissory estoppel claim based on Hardrives's reliance on the prices contained the September 1, 1998 writing barred by the OCC four-year statute of limitations because the alleged promise at issue involved the sale of goods. In addition, the magistrate judge rejected Cranpark's contention that Stump's delivery of aggregate to Hardrives after the September 1, 1998 writing made Hardrives's reliance on the aggregate prices listed in that writing justifiable, despite the fact that many of the contract conditions had not yet been fulfilled.

Additionally, "[a] court may not disregard evidence merely because it serves the interests of the party introducing it." *Id.*

Further, although Cranpark states in its opposition to RGI's summary judgment that "RGI made specific promises to Hardrives on September 1, 1998 regarding the Hardrives-RGI ***partnership,*** and those promises were later memorialized in writing that same day," the word partnership is used colloquially. Cranpark has not claimed that the parties intended to share profits and losses, and need not do so in order to support its promissory estoppel claim. Further, Cranpark called the magistrate judge's attention to the separate promise that RGI allegedly made in December 1998, that its undertaking with Hardrives was still going forward.

In sum, the magistrate judge erroneously determined that Sabatine's deposition testimony could not be used to establish a genuine issue of material fact. Accordingly, we reverse the grant of summary judgment on this claim as well and remand for further proceedings consistent with this opinion.

**V.**

REVERSED and REMANDED for further proceedings consistent with this opinion.