[Cite as *Action Group, Inc. v. NanoStatics Corp.*, 2013-Ohio-5542.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Action Group, Inc., | : | |
| Plaintiff-Appellant, | : | |
| | : | No. 13AP-72 |
| v. | : | (C.P.C. No. 11CVH-02-1991) |
| NanoStatics Corporation, | : | (REGULAR CALENDAR) |
| Defendant-Appellee. | : | |

D E C I S I O N

Rendered on December 17, 2013

*Owens Law Office*, and *Robert M. Owens*, for appellant.

*Porter Wright Morris & Arthur, LLP*, and *Colleen Marshall*, for appellee.

APPEAL from the Franklin County Court of Common Pleas

KLATT, P.J.

{¶ 1} Appellant, Action Group, Inc., appeals a judgment of the Franklin County Court of Common Pleas in favor of appellee, NanoStatics Corporation. For the following reasons, we affirm in part and reverse in part that judgment.

{¶ 2} NanoStatics is a production volume nanofiber company that creates nanofibers for commercial use. Action Group is a company that specializes in product development, manufacturing, and fulfillment.

{¶ 3} In early 2010, NanoStatics approached Action Group seeking its services in developing and manufacturing certain items, including a "head" and components to support the head. After the initial contact, Action Group's president, Frank Denutte, sent NanoStatics' president and CEO a letter dated February 8, 2010 that stated:

> I look forward to working with NanoStatics and servicing your needs in the initial research and development stage along with the production stage of your products. Below are research and development hourly rates for the initial development of your project.
>
> Labor will be billed at an hourly rate of $60 per hour and $90 per hour for over time hours. We will invoice these hours on a weekly basis until the initial development stage is complete. This hourly rate is significantly lower than our standard rate as we hope to develop a lasting relationship with you on this project. We are a service driven organization and this is a great opportunity to work in the field of nanotechnology.
>
> Once the initial development stage is complete, we will price our services at cost plus 30% on the production of your items. Our team is flexible on servicing many different industries and customers and with our teams in the local vicinity, we will be able to work with your organization effectively.
>
> Please sign and return this document as it will serve as our agreement on our services provided. * * *

(R. 131.) NanoStatics' president and CEO signed the letter.

{¶ 4} Using NanoStatics' specifications, Action Group worked on multiple iterations of the head. Ultimately, NanoStatics gave Action Group a computer model of a monolithic plastic head that it wanted produced. On September 30, 2010, representatives from NanoStatics visited Action Group's facility to inspect the monolithic plastic head and the supporting components. According to NanoStatics, its representatives determined that the monolithic plastic head had severe defects and was unusable. The NanoStatics representatives also determined that the supporting components did not conform to the tolerances and dimensions that NanoStatics had given Action Group. Due to the defects in the monolithic plastic head, NanoStatics rejected delivery of it. Although NanoStatics accepted delivery of some of the substandard components, it had to modify the design of its system to use those components.

{¶ 5} On February 11, 2011, Action Group filed a breach-of-contract action against NanoStatics. In the complaint, Action Group alleged that "[NanoStatics] ordered [Action Group] to manufacture certain goods that were timely delivered to [NanoStatics] and accepted by [NanoStatics] without defect." (R. 1 at ¶ 6.) Action Group contended that

NanoStatics breached its contract with Action Group by not paying for the goods provided, and that NanoStatics owed Action Group $96,163.90.[1]

{¶ 6} NanoStatics answered the complaint and asserted a counterclaim. According to NanoStatics' counterclaim, Action Group promised to develop and manufacture the items that NanoStatics ordered using procedures certified as compliant with ISO 9001:2008. ISO 9001:2008 is an internationally recognized industry standard for quality management systems. It specifies procedures that ensure the consistent production of items that meet customer or government specifications. A certification body may assess the quality management system of a particular company and, if that company has successfully implemented the requirements of ISO 9001:2008, the certification body will certify the company as ISO 9001:2008 compliant. Action Group has an ISO 9001:2008 certification.

{¶ 7} In its counterclaim, NanoStatics averred that Action Group breached its express warranties that (1) Action Group would comply with its ISO 9001:2008 certified procedures, and (2) the monolithic plastic head and supporting components would conform to the specifications NanoStatics provided. Additionally, NanoStatics alleged that Action Group's failure to conform to the specifications breached the parties' contract. Finally, NanoStatics claimed that, when Action Group supplied it with defective and non-conforming goods, Action Group breached various implied warranties, including the warranties of merchantability and fitness for a particular purpose.

{¶ 8} On March 5, 2012, NanoStatics moved to compel full responses to its first set of interrogatories and requests for production. In part, NanoStatics sought discovery related to Action Group's ISO 9001:2008 certification. In response to the interrogatories and production requests related to the ISO 9001:2008 certification, Action Group had simply stated "[n]ot applicable" or "N/A." (R. 55.) NanoStatics asked the trial court to order Action Group to answer the relevant interrogatories and production requests. Action Group did not respond to NanoStatics' motion to compel.

{¶ 9} The trial court granted NanoStatics' motion to compel in an order dated April 13, 2012. The trial court required Action Group to provide complete responses to

---

[1] Action Group also asserted claims arising from NanoStatics' hiring of a former Action Group employee. The trial court granted NanoStatics summary judgment on those claims, and Action Group does not appeal that ruling.

NanoStatics' first set of interrogatories and requests for production by April 26, 2012. The trial court also awarded NanoStatics reasonable attorney fees incurred in pursuing the discovery responses and in preparing and prosecuting the motion to compel. The trial court directed NanoStatics to file and serve an affidavit detailing its attorney fees. The trial court allowed Action Group 14 days to file and serve any objections to the attorney fees set forth in the affidavit.

{¶ 10} In compliance with the trial court's order, NanoStatics' attorney submitted an affidavit stating that the attorney fees awarded in the April 13, 2012 order amounted to $6,067.50. Action Group did not object, or respond in any way, to the affidavit.

{¶ 11} Following the trial court's April 13, 2012 order, Action Group provided NanoStatics with a link to an on-line storage site containing more than 300 pages of documents. According to NanoStatics, the vast majority of the 300 pages were neither responsive to the discovery requests nor relevant to the case. For example, Action Group supplied NanoStatics with instructions on how to assemble a door, documents related to work for other customers, and photographs of boxes prepared for shipment to other customers. Significantly, the on-line storage site did not contain requested documents such as Action Group's quality manual; a copy of Action Group's ISO 9001:2008 certificate; design and review notes related to the items manufactured for NanoStatics; internal communications regarding design issues, inspection, and testing records; or records for any of the raw materials purchased for use in the manufacture of the relevant items.

{¶ 12} In a letter dated May 8, 2012, NanoStatics' attorney informed Action Group's attorney of the deficiencies in Action Group's discovery responses. The letter contained a list of the documents that NanoStatics sought, but Action Group had not provided. Action Group's attorney replied that "[m]y client says to the extent that documents exist on your request list, you have them already." (R. 91.)

{¶ 13} When NanoStatics' attorney deposed Frank Denutte, Action Group's president, she discovered that not only did many of the requested documents exist, but also that Denutte had no explanation for Action Group's failure to produce them. Denutte admitted that Action Group had an ISO 9001:2008 certificate, which hung in Action Group's lobby. The following colloquy about Action Group's certificate ensued:

Q: If you have a certificate, do you know why you have failed to produce it?

A: No.

Q: Can you produce it?

A: I would assume so.

Q: Why haven't you produced it?

A: I don't have an answer.

(R. 95 at 63.)

{¶ 14} Denutte also acknowledged that Action Group had a quality manual. When asked why Action Group had not provided its quality manual to NanoStatics, Denutte answered, "Same answer as before. I don't know." (R. 95 at 73.)

{¶ 15} On July 9, 2012, NanoStatics moved for dismissal of Action Group's claims because Action Group had failed to comply with the April 13, 2012 order compelling it to fully respond to NanoStatics' discovery requests. Citing to Denutte's deposition testimony, NanoStatics argued that Action Group's defiance of the April 13, 2012 order was willful and in bad faith.

{¶ 16} In its memorandum contra NanoStatics' motion to dismiss, Action Group first argued that it had turned over its quality manual. According to Action Group, NanoStatics introduced the quality manual as an exhibit during Denutte's deposition and used the manual to question Denutte. Next, Action Group blamed its discovery failures on Denutte's bout with multiple myeloma, which severely incapacitated him from May 2011 to June 2012.

{¶ 17} At the same time it responded to NanoStatics' motion to dismiss, Action Group moved for reconsideration of the portion of the April 13, 2012 order that awarded NanoStatics its attorney fees. Action Group advanced Denutte's illness as the basis for reconsidering that order and relieving Action Group of the obligation to pay the fees.

{¶ 18} In its reply to Action Group's memorandum contra and motion to reconsider, NanoStatics accused Action Group of misrepresenting the record. NanoStatics asserted that, despite Action Group's contention otherwise, Action Group had not produced its quality manual. The deposition exhibit that Action Group claimed was

its quality manual was actually a copy of the ISO 9001:2008 requirements that was licensed to NanoStatics. Because NanoStatics did not know the specific procedures adopted in Action Group's quality manual, NanoStatics' attorney instead questioned Denutte using the universal standard set forth in the ISO 9001:2008 requirements.

{¶ 19} NanoStatics also attacked Action Group's claim that Denutte's illness was the cause of Action Group's failure to respond to NanoStatics' discovery requests. NanoStatics pointed out that Denutte testified during his deposition that Tracy Garner, Action Group's vice president and general manager, had access to the disputed documents and should have provided them to Action Group's attorney. Garner was the point person for ensuring that Action Group complied with the ISO 9001:2008 requirements. NanoStatics thus argued that Action Group could not rely on Denutte's illness as an excuse for failing to produce documents that Garner regularly worked with and relied on.

{¶ 20} In a decision and entry dated October 10, 2012, the trial court granted NanoStatics' motion to dismiss and denied Action Group's motion for reconsideration. The trial court found that documents that NanoStatics had requested existed, and that Action Group had failed to produce those documents. The trial court also found that Action Group had not offered any legitimate or reasonable explanation for its failure to provide the documents. In addition to dismissing Action Group's claims, the trial court ordered Action Group to pay the costs and attorney fees NanoStatics incurred for the preparation of the motion to dismiss, as well as the costs and attorney fees related to Action Group's failure to properly respond to discovery and its failure to obey the April 13, 2012 order.

{¶ 21} After the issuance of the October 10, 2012 decision and entry, NanoStatics' attorney submitted an affidavit stating that the attorney fees generated from dealing with discovery deficiencies and briefing NanoStatics' motion to dismiss totaled $15,379.25. Although Action Group had not responded to NanoStatics' attorney's first affidavit in support of attorney fees, it responded to the second. Action Group argued that NanoStatics sought fees for work that was not related to dealing with Action Group's discovery violations, and that the fees sought might be excessive. Action Group asked the trial court to deny NanoStatics its attorney fees or, alternatively, to hold a hearing to determine the appropriate amount of fees.

{¶ 22} On November 16, 2012, NanoStatics moved for summary judgment on its counterclaim. NanoStatics cited two reasons justifying summary judgment. First, NanoStatics argued that the trial court should grant it summary judgment as a sanction for Action Group's discovery violations. Second, NanoStatics argued that it deserved summary judgment under the Civ.R. 56 standard. With regard to its claims for breach of the implied warranties, NanoStatics asserted that undisputed evidence established that the monolithic plastic head was defective and that the head's defects rendered it unusable. Thus, NanoStatics contended, in manufacturing a head unfit for any use, Action Group breached the implied warranties of merchantability, as set forth in R.C. 1302.27, and fitness for a particular purpose, as set forth in R.C. 1302.28. NanoStatics also argued that the evidence established that Action Group had impliedly and expressly warranted that it would adhere to its ISO 9001:2008 certified procedures when developing and manufacturing the monolithic plastic head and the supporting components. Because Action Group admittedly did not follow those procedures, it breached those implied and express warranties.

{¶ 23} Action Group responded that the trial court had already sanctioned it for its failure to produce discovery and no additional sanction was warranted. As for NanoStatics' argument that it was entitled to summary judgment under Civ.R. 56, Action Group asserted that NanoStatics could not recover on its claims because they were based on Ohio's version of the Uniform Commercial Code ("UCC"), which did not govern the parties' contract. Action Group contended that the provision of services, not the sale of goods, was the predominant purpose of the parties' contract. As the UCC only applies to contracts for the sale of goods, Action Group maintained that NanoStatics could not establish any claim based on UCC provisions.

{¶ 24} In a decision granting NanoStatics' motion, the trial court concluded that NanoStatics was entitled to summary judgment pursuant to Civ.R. 56. The trial court issued a judgment, dated December 28, 2012, entering summary judgment for NanoStatics and ordering Action Group to pay $102,200 in damages and $21,446 in attorney fees.

{¶ 25} Action Group now appeals the December 28, 2012 judgment, and it assigns the following errors:

[1.]  The trial court did not issue a final appealable order.

[2.]  The trial court erred by dismissing Action Group's claims.

[3.]  The trial court erred by granting summary judgment in favor of NanoStatics.

[4.]  The trial court erred by awarding attorneys' fees to NanoStatics.

{¶ 26} By Action Group's first assignment of error, it argues that the December 28, 2012 judgment is not a final, appealable order.  Action Group first raised this argument in a motion, which we considered and denied.  Accordingly, we overrule Action Group's first assignment of error.

{¶ 27} By Action Group's second assignment of error, it argues that the trial court erred in dismissing its claims as a discovery sanction.  We disagree.

{¶ 28} Two Ohio Rules of Civil Procedure authorize the dismissal of claims for the failure to comply with a court order.  Civ.R. 37(B)(2)(c) allows dismissal after a violation of an order to compel discovery:

If any party * * * fails to obey an order to provide or permit discovery, including an order made under subdivision (A) 0f this rule * * *, the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

* * *

(c) * * * [D]ismissing the action or proceeding or any part thereof[.]

Civ.R. 41(B)(1) permits a trial court to dismiss an action or claim where a plaintiff fails to comply with any court order, whether related to discovery or not.

{¶ 29} The decision to dismiss under Civ.R. 37(B)(2)(c) and 41(B)(1) is within the sound discretion of the trial court.  *Quonset Hut, Inc. v. Ford Motor Co.*, 80 Ohio St.3d 46, 47 (1997); *Toney v. Berkemer*, 6 Ohio St.3d 455, 458 (1983).  However, that discretion must be cautiously exercised.  *Quonset Hut, Inc.* at 48.  Before dismissing claims for violation of a discovery order, a trial court must find that the failure to comply is due to willfulness, bad faith, or any fault of the plaintiff.  *Toney* at 458.  Appellate courts will

affirm the dismissal "when 'the conduct of a party is so negligent, irresponsible, contumacious or dilatory as to provide substantial grounds for a dismissal with prejudice for a failure to * * * obey a court order.' " *Quonset Hut, Inc.* at 48, quoting *Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 632 (1992).

{¶ 30} Here, Action Group argues that its violation of the order compelling discovery is not its fault, but instead, a consequence of Denutte's battle with cancer. We, like the trial court, reject this argument. Although Denutte may not have been well enough to collect the documents requested by NanoStatics, nothing precluded Action Group's vice president and general manager, Tracy Garner, from doing so. In his deposition, Denutte identified Garner as the person responsible for gathering documents responsive to NanoStatics' discovery requests. Now, on appeal, Action Group defends Garner's failure to carry out that responsibility by claiming that Garner did not have the comprehensive knowledge of Action Group's records that Denutte had.

{¶ 31} First, we doubt that Garner's lack of knowledge caused the discovery failures. In his deposition, Garner denied knowing that NanoStatics had requested a copy of Action Group's quality manual. Thus, it appears that poor communication, not lack of knowledge, led to the incomplete document production.

{¶ 32} Even if we accept Action Group's excuse as true, it does not entirely explain why Action Group failed to comply with the discovery order. Garner did not need Denutte's knowledge to locate the ISO 9001:2008 certificate hanging in Action Group's lobby or the quality manual in Garner's office. Nothing impeded Garner from providing a copy of those documents to Action Group's attorney so he could produce them in response to NanoStatics' discovery requests.

{¶ 33} Moreover, Denutte had resumed working at the time of his June 26, 2012 deposition. During that deposition, NanoStatics' attorney directly informed Denutte that it had requested Action Group's ISO 9001:2008 certificate and quality manual. Denutte promised to produce the quality manual within "two weeks, max." (R. 95 at 74.) Action Group's subsequent failure to deliver that document or, for that matter, other responsive documents, cannot be blamed on Denutte's illness.

{¶ 34} Based on the evidence in the record, we find that, at best, Action Group did not take its obligation to comply with the trial court's discovery order seriously. At worst,

Action Group showed outright contempt for the order by supplying NanoStatics with hundreds of pages of irrelevant records and informing NanoStatics that it had produced all responsive documents, when it had not. Given Action Group's pattern of noncompliance and obfuscation, we conclude that the trial court did not abuse its discretion in dismissing Action Group's claims as a discovery sanction. Accordingly, we overrule Action Group's second assignment of error.

{¶ 35} By Action Group's third assignment of error, it argues that the trial court erred in granting NanoStatics summary judgment on its claims. We agree.

{¶ 36} Initially, we must address NanoStatics' contention that the trial court appropriately granted summary judgment as a discovery sanction. NanoStatics may have requested summary judgment as a Civ.R. 37(B)(2) sanction, but the trial court did not grant summary judgment on that basis. The trial court, instead, relied solely on Civ.R. 56 when deciding NanoStatics' motion for summary judgment. Consequently, in advocating before this court that summary judgment is appropriate under Civ.R. 37(B)(2), NanoStatics wants this court to expand the discovery sanction imposed by the trial court to include a judgment in NanoStatics' favor on its claims. We decline to do so. In this matter, we are tasked with reviewing the trial court's ruling, not deciding in the first instance matters left to the trial court's sound discretion. Thus, we turn to reviewing whether NanoStatics deserved summary judgment under Civ.R. 56.

{¶ 37} A trial court will grant summary judgment under Civ.R. 56 when the moving party demonstrates that: (1) there is no genuine issue of material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion when viewing the evidence most strongly in favor of the nonmoving party, and that conclusion is adverse to the nonmoving party. *Hudson v. Petrosurance, Inc.*, 127 Ohio St.3d 54, 2010-Ohio-4505, ¶ 29; *Sinnott v. Aqua-Chem, Inc.*, 116 Ohio St.3d 158, 2007-Ohio-5584, ¶ 29. Appellate review of a trial court's ruling on a motion for summary judgment is de novo. *Hudson* at ¶ 29. This means that an appellate court conducts an independent review, without deference to the trial court's determination. *Zurz v. 770 W. Broad AGA, L.L.C.*, 192 Ohio App.3d 521, 2011-Ohio-832, ¶ 5 (10th Dist.); *White v. Westfall*, 183 Ohio App.3d 807, 2009-Ohio-4490, ¶ 6 (10th Dist.).

{¶ 38} Here, Action Group argues that the parties' contract is not governed by the UCC, and thus, it urges us to reverse the grant of summary judgment for NanoStatics on its UCC claims. Article Two of the UCC, adopted in Ohio as R.C. 1302.01 to 1302.98, applies to transactions for the sale of goods, not to service contracts. R.C. 1302.02; *Tubelite Co. v. Original Sign Studio, Inc.*, 176 Ohio App.3d 241, 2008-Ohio-1905, ¶ 12 (10th Dist.); *Fox & Lamberth Ents., Inc. v. Craftsman Home Improvement*, 2d Dist. No. 21060, 2006-Ohio-1427, ¶ 25. Action Group contends that its contract with NanoStatics is a contract for services, not a contract for goods, so the UCC does not apply.

{¶ 39} In reply, NanoStatics asserts that whether the UCC is applicable is irrelevant. Regardless of the law applied, NanoStatics argues, it is entitled to summary judgment because Action Group supplied it with defective products. This argument would have been persuasive had NanoStatics supported it with law showing that the receipt of defective products entitles a party to recovery under both the UCC and common law. NanoStatics, however, points only to UCC provisions—R.C. 1302.27 (implied warranty of merchantability) and R.C. 1302.28 (implied warranty of fitness for a particular purpose)—to support its contention that the supply of defective products justifies summary judgment in its favor. Neither NanoStatics' motion for summary judgment nor its appellate brief identifies any other legal basis for recovery due to the receipt of defective goods. In order to prevail on any defective-goods claim, therefore, NanoStatics must establish that the UCC applies.

{¶ 40} A review of the parties' contract reveals that it is neither a contract solely for goods nor a contract solely for services, but a contract for both goods and services. The contract contemplates a "research and development stage," during which Action Group would provide NanoStatics with services, and a "production stage," during which Action Group would provide NanoStatics with goods. The parties, therefore, entered into hybrid transaction.

{¶ 41} Despite the plain language of the contract, Action Group denies that the parties' transaction involved any sale of goods. Action Group argues that the contract does not include the sale of goods because it does not identify the specific goods purchased. Action Group also argues that the contract's failure to comply with the UCC's statute of frauds demonstrates that the parties did not intend for the contract to fall under

the UCC.  Action Group failed to make either of these arguments in the trial court. Generally, a party waives the right to raise an argument on appeal it could have raised, but did not, in earlier proceedings.  *Niskanen v. Giant Eagle, Inc.*, 122 Ohio St.3d 486, 2009-Ohio-3626, ¶ 34.  Because Action Group did not assert its arguments before the trial court, it cannot now raise them on appeal.

{¶ 42} When presented with a hybrid contract, Ohio courts, like the majority of courts, follow the predominant-purpose test to determine whether or not the UCC applies. *Carcorp, Inc. v. Chesrown Oldsmobile-GMC Truck, Inc.*, 159 Ohio App.3d 87, 2004-Ohio-5946, ¶ 21 (10th Dist.); *DeHoff v. Veterinary Hosp. Operations of Cent. Ohio, Inc.*, 10th Dist. No. 02AP-454, 2003-Ohio-3334, ¶ 73.  The predominant-purpose test examines " 'whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved.' "  *Carcorp, Inc.* at ¶ 21, quoting *Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.*, 62 Ohio App.2d 144, 147 (6th Dist.1977).  This test requires consideration of both the contractual language and extrinsic evidence, such as the circumstances surrounding the contract formation and the parties' performance of the contract.  *Cranpark, Inc. v. Rogers Group, Inc.*, 498 Fed.Appx. 563, 568 (6th Cir.2012); *Arlington Elec. Constr. v. Schindler Elevator Corp.*, 6th Dist. No. L-91-102 (Mar. 6, 1992); *accord* 1A Anderson, *Uniform Commercial Code*, Section 2-105:113 (3d Ed.1996) ("As the making of the determination that a hybrid contract is predominantly a contract for the goods or predominantly for services requires what is basically a quantitative analysis, it is necessary for the court to consider all circumstances of the case, the commercial or non-commercial setting in which the case arises, as well as the terms of the contract itself.").

{¶ 43} Generally, whether a hybrid contract is predominately a contract for goods or services presents a factual question.  *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F.Supp.2d 971, 976 (S.D.Ohio 2004); *Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 10th Dist. No. 03AP-269, 2004-Ohio-1408, ¶ 50, *rev'd on other grounds*, 106 Ohio St.3d 412, 2005-Ohio-5409; *Valleaire Golf Club, Inc. v. Conrad*, 9th Dist. No. 03CA0006-M, 2003-Ohio-6575, ¶ 6.  Where, however, there are no disputed facts for a fact finder to decide, it is proper for a trial court to rule as a matter of law on whether the

contract is covered by Article Two of the UCC. *Mecanique C.N.C., Inc.* at 976-77; *Corporex Dev. & Constr. Mgt., Inc.* at ¶ 50-51; *Conrad* at ¶ 6.

{¶ 44} Here, the parties do not identify any disputed facts relative to the question of whether the provision of goods or services predominates. Therefore, we must determine, as a matter law, the parties' primary purpose. After considering the contract and the testimony of Action Group's president and NanoStatics' president and CEO, we conclude that the parties' overall objective was the production of goods, i.e., the head and its supporting components. Those goods were what NanoStatics ultimately wanted and what Action Group promised to deliver.

{¶ 45} True, Action Group performed a substantial amount of services for NanoStatics in the development of the head and components. However,

> virtually all commercial goods involve some type of service, 'whether design, assembly, installation, or manufacture.' * * * The mere fact that a manufacturer utilizes its effort and expertise in producing a good does not mean that the buyer is purchasing those services instead of the good itself. The question is whether the purchaser's ultimate goal is to acquire a product or procure a service.

*Mecanique C.N.C., Inc.* at 977, quoting *Neibarger v. Universal Coops., Inc.*, 439 Mich. 512, 536 (1992). Therefore, spending significant time and resources to design or engineer the product sold does not transform a contract for goods into a contract for services. *BMC Industries, Inc. v. Barth Industries, Inc.*, 160 F.3d 1322, 1332 (11th Cir.1998); *Republic Steel Corp. v. Pennsylvania Eng. Corp.*, 785 F.2d 174, 181 (7th Cir.1986).

{¶ 46} Moreover, our conclusion is influenced by the way Action Group described its contract with NanoStatics in its complaint. How the parties characterize their contract is a factor that a court can consider in determining whether goods or services predominate. *Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F.Supp.2d 959, 972 (N.D.Ind.2011); *Mitchell v. Speedy Car-X, Inc.*, 127 Ohio App.3d 229, 232 (9th Dist.1998). In considering that factor, we find it significant that, in its complaint, Action Group portrayed the parties' contract as one for the manufacture of goods, not the rendition of services. (R. 1 at ¶ 4.) The complaint also alleged that NanoStatics ordered Action Group to manufacture goods, and that Action Group sought payment "for manufactured goods as requested by and delivered to [NanoStatics]." (R. 1 at ¶ 6, 40.)

Thus, despite the hybrid nature of the parties' contract, Action Group initially characterized its dealings with NanoStatics as solely a transaction for the sale of goods.

{¶ 47} We recognize that Action Group later denied NanoStatics' averment in its counterclaim that the head and components were goods within the meaning of R.C. 1302.01(A)(8). Nevertheless, before NanoStatics introduced the question of the UCC's applicability, Action Group construed the contract as one for the provision of goods, not services.

{¶ 48} As the parties' contract is predominantly a contract for goods, the UCC applies. We thus turn to the question of whether NanoStatics met its burden under Civ.R. 56 to prove its entitlement to summary judgment on its UCC claims.

{¶ 49} As we stated above, NanoStatics sought and received summary judgment on its claims for breach of the implied warranties of merchantability and fitness for a particular purpose. NanoStatics argues that it is entitled to summary judgment on both claims because Action Group supplied it with defective, unusable goods. However, NanoStatics has failed to present proof that it is entitled to summary judgment on its breach of implied warranty claims.

{¶ 50} We will first address NanoStatics' claim for breach of the implied warranty of merchantability. Pursuant to R.C. 1302.27(A), "[u]nless excluded or modified as provided in section 1302.29 of the Revised Code, a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." R.C. 1302.27(B) sets forth the minimum criteria that goods must meet in order to be merchantable. Any failure of the goods to comply with the criteria set forth in R.C. 1302.27(B) is a breach of the implied warranty of merchantability.

{¶ 51} NanoStatics has not identified which of the six criteria the monolithic plastic head and supporting components failed to satisfy. However, of the six criteria, only the third arguably applies. Under that criterion, to be merchantable, goods must be "fit for the ordinary purposes for which such goods are used." R.C. 3102.27(B)(3). This criterion expresses a fundamental concept in the meaning of merchantability. UCC Official Comment, Section 2-314, Comment 8 (1961); 1 Hawkland & Rusch, *Uniform Commercial Code Series*, Section 2-314:3.

{¶ 52} To show a breach of the third criterion, a plaintiff must first identify the ordinary purpose of the goods purchased. *Koken v. Black & Veatch Constr., Inc.*, 426 F.3d 39, 51 (1st Cir.2005); *Bethlehem Steel Corp. v. Chicago E. Corp.*, 863 F.2d 508, 514-15 (7th Cir.1988); *Elvig v. Nintendo of Am., Inc.*, D.Colo. No. 08-cv-02616-MSK-MEH (Sept. 23, 2010). "[T]he ordinary purposes for which goods are used * * * go to uses which are customarily made of the goods in question." UCC Official Comment, Section 2-315, Comment 2 (1961); *accord Koken* at 51; *Doll v. Ford Motor Co.*, 814 F.Supp.2d 526, 544 (D.Md.2011); *Conveyor Co. v. SunSource Technology Servs., Inc.*, 398 F.Supp.2d 992, 1002 (N.D.Iowa 2005). Here, NanoStatics did not present any evidence explaining how the monolithic plastic head and supporting components worked, what they did, or their purpose. The record, therefore, contains no evidence of the ordinary, customary use of the head and components.

{¶ 53} Moreover, given the evidence in the record, we question whether the head and components even have an ordinary purpose. The president of Action Group indicated in his deposition that the items Action Group manufactured for NanoStatics had never been manufactured before. Under such circumstances, the goods could not have any ordinary purpose, and thus, the implied warranty of merchantability based on fitness for ordinary purposes could not arise. *Norcold, Inc. v. Gateway Supply Co.*, 154 Ohio App.3d 594, 2003-Ohio-4252, ¶ 23 (3d Dist.) (when no one had previously manufactured the parts at issue, " 'no average or usual standards for determining ordinary performance or quality for the components can be determined' "); *accord Binks Mfg. Co. v. Natl. Presto Industries, Inc.*, 709 F.2d 1109, 1121-22 (7th Cir.1983) (because the goods at issue were unlike any other goods previously manufactured, there was no ordinary purpose for the goods and no implied warranty of merchantability could exist); *Price Bros. Co. v. Philadelphia Gear Corp.*, 649 F.2d 416, 424 (6th Cir.1981) (same).

{¶ 54} In any event, NanoStatics has not come forward with any evidence regarding the ordinary purpose of the head and components. Such evidence is necessary to establish a breach of the standard of merchantability set forth in R.C. 1302.27(B)(3). Consequently, the trial court erred in granting NanoStatics summary judgment on its claim for breach of the implied warranty of merchantability.

{¶ 55}   We next consider NanoStatics' claim for breach of the implied warranty of fitness for a particular purpose.  Under R.C. 1302.28,

> [w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under section 1302.29 of the Revised Code an implied warranty that the goods shall be fit for such purpose.

For an implied warranty of fitness for a particular purpose to arise, (1) the seller must have reason to know the buyer's particular purpose, (2) the seller must have reason to know that the buyer is relying on the seller's skill or judgment to select or furnish appropriate goods, and (3) the buyer must, in fact, rely on the seller's skill or judgment. *EBCO Mfg. Co. v. Eaton Corp.*, 10th Dist. No. 94APE08-1147 (Apr. 20, 1995); *Hollingsworth v. Software House, Inc.*, 32 Ohio App.3d 61, 65 (2d Dist.1986).  "The heart of the concept is the justifiable reliance by the buyer on the seller's skill or judgment in providing goods for the buyer's special needs."  Hawkland & Rusch, *Uniform Commercial Code Series*, Section 2-315:1.

{¶ 56}  In the case at bar, NanoStatics produced no evidence that it relied on Action Group's skill or judgment to provide it with appropriate products for its particular purpose.  With regard to the monolithic plastic head, the evidence actually suggests the opposite.   According to Action Group's president, Action Group constructed the monolithic plastic head by following a computer model provided by NanoStatics.  When a buyer gives precise and complete specifications to the seller, the warranty of fitness for a particular purpose does not normally arise.  *New Jersey Transit Corp. v. Harsco Corp.*, 497 F.3d 323, 329 (3d Cir.2007); *Bethlehem Steel Corp.*, 863 F.2d at 516; *Lesnefsky v. Fischer & Porter Co.*, 527 F.Supp. 951, 956-57 (E.D.Penn.1981); UCC Official Comment, Section 2-316, Comment 9; 3A Anderson, *Uniform Commercial Code*, Section 2-315:134 (3d Ed.2002).   In that situation, the buyer eschews reliance on the seller's skill or judgment to furnish the appropriate goods and, instead, requires the seller to follow the buyer's own judgment regarding what goods would best serve its purposes.  *Bethlehem Steel Corp.* at 516; Anderson, Section 2-315:134.

{¶ 57} Here, the evidence does not disclose the specificity of the computer model. Consequently, we cannot determine to what degree, if any, NanoStatics depended on

Action Group to exercise its own judgment in manufacturing the monolithic plastic head. If the computer model left any construction details to Action Group's discretion, NanoStatics could conceivably produce evidence that it relied on Action Group's skill and judgment to appropriately exercise that discretion. Nevertheless, at this stage in the proceedings, the record does not contain evidence establishing NanoStatics' reliance. The trial court, therefore, erred in granting NanoStatics summary judgment on its claim for breach of the implied warranty of fitness for a particular purpose.

{¶ 58} Now that we have addressed the claims based on the receipt of defective goods, we turn to NanoStatics' claims that Action Group breached implied and express warranties by failing to follow its ISO 9001:2008 certified processes. Like the defective-goods claims, the ISO claims lack sufficient evidentiary support.

{¶ 59} First, NanoStatics argues that Action Group breached an implied warranty that it would comply with its ISO 9001:2008 certified processes when manufacturing NanoStatics' goods. NanoStatics, however, does not identify any law or facts that establish such an implied warranty. Based on the facts of this case, we cannot see how such a warranty fits with either the implied warranties of merchantability or fitness for a particular purpose. Other implied warranties may exist. R.C. 1302.27(C) states that, "[u]nless excluded or modified as provided in section 1302.29 of the Revised Code, other implied warranties may arise from course of dealing or usage of trade." Conceivably, NanoStatics could prove that members of Action Group's trade regularly adhere to their ISO 9001:2008 certified processes, thus proving an implied warranty of ISO compliance. However, based on the evidence currently in the record, NanoStatics has not demonstrated any such implied warranty. The trial court, therefore, erred in granting NanoStatics summary judgment on its claim for breach of implied warranty.

{¶ 60} NanoStatics also argues that Action Group breached an express warranty that it would follow its ISO 9001:2008 certified processes when manufacturing NanoStatics' goods. R.C. 1302.26 sets forth three ways in which an express warranty may arise. Although NanoStatics does not specify which of the three ways applies here, only the first fits the facts that NanoStatics relies on. Under that way, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the

affirmation or promise."  R.C. 1302.26(A)(1).  A seller does not need to use formal words such as "warrant" or "guarantee" to create a warranty.  R.C. 1302.26(B).  Any affirmation by the seller that forms the basis of the bargain may establish an express warranty. *Slyman v. Pickwick Farms*, 15 Ohio App.3d 25, 27-28 (10th Dist.1984).  An affirmation forms the basis of the bargain if it "goes to the heart of the basic assumption between the parties."  *Bobb Forest Prods., Inc. v. Morbark Industries, Inc.*, 151 Ohio App.3d 63, 2002-Ohio-5370, ¶ 49 (7th Dist.).

{¶ 61} Here, if Action Group affirmed or promised that it would manufacture NanoStatics' goods using its ISO 9001:2008 certified processes, then an express warranty to that effect would arise.  NanoStatics presented evidence that Action Group's website, business cards, and letterhead all state that Action Group is an ISO 9001:2008 certified company.  Yet, the record contains no evidence that any Action Group representative told a NanoStatics representative that Action Group would be following its ISO 9001:2008 processes in manufacturing NanoStatics' goods.  NanoStatics' president and CEO instead merely testified that he "fully expected that in its work on behalf of NanoStatics Action Group would follow the ISO certified processes."  (R. 131 at ¶ 6.)[2]

{¶ 62} A buyer's understanding or expectation does not give rise to an express warranty.  *Dow Corning Corp. v. Weather Shield Mfg., Inc.*, 790 F.Supp.2d 604, 611 (E.D.Mich.2011); 3A Anderson, *Uniform Commercial Code*, Section 2-313:45 (3d Ed.2002).  "As there must be a statement by the seller before it is necessary to determine whether that statement is a part of the basis of the bargain, it follows that the subjective beliefs of the buyer that are never communicated to the seller cannot be a part of the basis of the bargain."  *Id.*  Applying that rule here, we conclude that NanoStatics' president and CEO's expectation cannot create an express warranty.  In the absence of an affirmation or promise that Action Group would manufacture NanoStatics' products in accordance with the ISO 9001:2008 certified processes, no express warranty to that effect could arise.  The record contains no evidence of such an affirmation or promise.  Accordingly, the trial

---

[2] In his deposition, Action Group's president seems to state that the ISO 9001:2008 certified processes apply only to mass production, not the manufacture of first-article goods like the goods produced for NanoStatics.  Whether this is true or merely the president's belief, it explains the absence of any affirmation or promise from Action Group that it would follow the ISO 9001:2008 certified processes when fabricating the monolithic plastic head and supporting components.

court erred in granting NanoStatics summary judgment on its claim for breach of express warranty.

{¶ 63} In sum, we conclude that NanoStatics is not entitled to summary judgment on any of the grounds argued.  Accordingly, we sustain Action Group's third assignment of error.

{¶ 64} By Action Group's fourth assignment of error, it argues that the trial court erred in granting NanoStatics attorney fees.  For the most part, we find that the trial court did not err as alleged.  To the extent that the trial court did err, that error did not prejudice Action Group.

{¶ 65} The trial court awarded NanoStatics attorney fees in two instances:   (1) when it granted NanoStatics' motion for an order to compel, and (2) when it granted NanoStatics' motion for dismissal as a discovery sanction.  In each instance, after the trial court made the award, NanoStatics' attorney submitted affidavits setting forth her calculation of the amount of fees owed.  The first affidavit lists that the amount owed as $6,067.50, and the second lists $15,379.25, for a total of $21,446.75.  In its December 28, 2012 judgment entry, the trial court ordered Action Group to pay "$21,446.00 in attorneys' fees previously awarded by the Court."  (R. 139.)

{¶ 66} Initially, we must address Action Group's argument that the December 28, 2012 judgment does not unambiguously award NanoStatics $21,446 in attorney fees. Action Group takes issue with the trial court's statement that attorney fees were "previously awarded," when the trial court had not previously determined any amount of attorney fees owed.  We find this argument disingenuous.  In its April 13, 2012 and October 10, 2012 entries, the trial court indisputably awarded attorneys fees, even if it did not state the amount of those fees.  In the December 28, 2012 judgment, the trial court set the amount of attorney fees "previously awarded" at $21,446.  No ambiguity exists.

{¶ 67} Action Group next argues that the trial court erred in granting NanoStatics any attorney fees at all.  We disagree.

{¶ 68} Pursuant to Civ.R. 37(A)(4), a trial court is generally required to award reasonable expenses incurred, including attorney fees, to the party who prevails on a motion for an order compelling discovery.  *Cryer v. Cryer*, 10th Dist. No. 07AP-546, 2008-Ohio-26, ¶ 31; *Stratman v. Sutantio*, 10th Dist. No. 05AP-1260, 2006-Ohio-4712,

¶ 29.  Likewise, under Civ.R. 37(B)(2), a court is generally required to order the party who fails to obey a discovery order to pay the opposing party's reasonable expenses, including attorney fees.  *Bellamy v. Montgomery*, 10th Dist. No. 11AP-1059, 2012-Ohio-4304, ¶ 11. Under both Civ.R. 37(A)(4) and 37(B)(2), a trial court may forego an award of attorney fees only if the court finds that the uncooperative party's actions are substantially justified or other circumstances make the award unjust.  An appellate court reviews an award of attorney fees under either Civ.R. 37(A)(4) or 37(B)(2) for an abuse of discretion.  *Bellamy* at ¶ 7; *Pegram v. Painter*, 5th Dist. No. 09 CA 59, 2010-Ohio-2934, ¶ 40.

{¶ 69}  Here, Action Group argues that its president's ill health makes the award of attorney fees in the order to compel unjust.  Parties generally assert such an argument as a reason to deny a motion for a discovery sanction.  However, it could also serve as a reason why a trial court might decline to award attorney fees in an order to compel.  If an extended illness of a key employee impacted the employer's ability to collect and transmit discovery, that illness could make an award of attorney fees unjust.  We, however, find that argument unavailing here.  As we stated above, the trial court rejected Action Group's illness excuse, and we concur with that rejection.  We thus find no error in the trial court's decision to award NanoStatics attorney fees in the order to compel.

{¶ 70}  We next turn to the award of attorney fees in the dismissal entry.  Action Group did not address in its memorandum contra the request for attorney fees incorporated into NanoStatics' motion for dismissal.  After NanoStatics' attorney filed an affidavit setting forth her calculation of the amount of attorney fees owed under the dismissal entry, Action Group only challenged the amount, not the appropriateness, of the attorney-fee award.  A party who fails to raise an argument before the trial court waives the right to make that argument on appeal.  *Niskanen*, 122 Ohio St.3d 486, 2009-Ohio-3626, at ¶ 34.  Because Action Group did not attack the appropriateness of the attorney-fee award before the trial court, it cannot undertake such an attack on appeal.

{¶ 71}  As a final matter, Action Group argues that the trial court erred in not articulating how it arrived at the amount of attorney fees to award NanoStatics.  Action Group correctly states that the trial court did not state the evidentiary basis for its award. Nevertheless, the record contains evidence—namely, the affidavits of NanoStatics' attorney—that justify the amount awarded.  The first affidavit states:

13. * * * I reviewed all invoices related to this matter, calculating time reasonably connected to dealing with the discovery deficiencies and preparing NanoStatics' Motion to Compel and for Sanctions at $6,067.50. * * *

14. Given the amount of work performed[,] the level of experience of those who performed the work, [and] the nature and the complexity of pursuing resolution to this matter, $6,067.50 is a reasonable amount of attorneys' fees.

(R. 79.)   The second affidavit states:

10. * * * I reviewed all invoices related to this matter, calculating time reasonably connected to dealing with the discovery deficiencies and briefing NanoStatics' Motion to Dismiss at $15,379.25. * * *

11. Given the amount of work performed[,] the level of experience of those who performed the work, [and] the nature and the complexity of pursuing resolution to this matter, $15,379.25 is a reasonable amount of attorneys' fees.

(R. 125.)   The amounts listed in the two affidavits—$6,067.50 and $15,379.25—total $21,446.75.   NanoStatics' attorney attached to each affidavit a table with entries that specify the date on which the work was performed, the name of the attorney that performed the work, the number of hours worked, the amount charged for those hours, and a description of the work performed.

{¶ 72} We do not find persuasive Action Group's argument that the trial court did not rely on the affidavits and their attachments to determine the amount of attorney fees. Action Group points out that the trial court awarded NanoStatics $21,446 in attorney fees, not $21,466.75.  Relying on the $0.75 difference between the amount set by the trial court and the amount testified to in the attorney's affidavits, Action Group contends the affidavits are not evidence supporting the trial court's award.  We disagree.  The $0.75 difference is not so great that it throws into question what evidence the trial court used to reach the amount of attorney fees awarded.

{¶ 73} Even though we know what evidence the trial court used to calculate the attorney fees, we normally would require an explanation for why the trial court found $21,466 to be a reasonable amount.  *Adams, Babner & Gitlitz, LLC v. Tartan Dev. Co. (West), LLC*, 10th Dist. No. 12AP-729, 2013-Ohio-1573, ¶ 18; *Jubilee Ltd. Partnership v.*

*Hosp. Properties, Inc.*, 10th Dist. No. 09AP-1145, 2010-Ohio-5550, ¶ 51-52. We impose this requirement to ensure our ability to meaningfully review the trial court's attorney-fee calculation. *Id.* We nevertheless conclude that the absence of an explanation does not warrant reversal in this case. A reviewing court will not disturb a judgment unless the error contained within is materially prejudicial to the complaining party. *Alternatives Unlimited-Special, Inc. v. Ohio Dept. of Edn.*, 10th Dist. No. 12AP-647, 2013-Ohio-3890, ¶ 39. As we will explain, Action Group has not shown that the alleged error—the absence of explanation—prejudices it.

{¶ 74} When deciding the amount of an attorney-fee award, a trial court first multiplies the number of hours reasonably expended by the hourly fee, and then determines whether to modify that "lodestar" amount through consideration of the factors listed in Prof.Cond.R. 1.5. *Bittner v. Tri-Cty. Toyota, Inc.*, 58 Ohio St.3d 143 (1991), syllabus (applying the predecessor to Prof.Cond.R. 1.5). Here, the trial court simply adopted the lodestar amount, without modification, as the reasonable amount of attorney fees to award. On appeal, Action Group advances no argument that this was error or that the amount awarded is unreasonable. Action Group does not challenge the reasonableness of the number of hours worked or the amount of the hourly rates, whether the hours worked were reasonably expended, or the trial court's failure to modify the lodestar amount based on the factors in Prof.Cond.R. 1.5. We require the trial court to articulate an analysis of those matters so that we can review that analysis in determining whether the result—the amount of attorney fees awarded—is reasonable. However, as Action Group has not alleged any supposed error in either the analysis or the result, we have no need to review the analysis. In other words, the trial court's failure to set forth a reasonableness analysis is irrelevant where the appellant does not argue on appeal that the amount awarded is unreasonable. Without such an argument, the lack of an explanation does not prejudice the appellant.

{¶ 75} In sum, we find no error argued in the fourth assignment of error justifies reversal. Therefore, we overrule the fourth assignment of error.

{¶ 76} For the foregoing reasons, we overrule the first, second, and fourth assignments of error, and we sustain the third assignment of error. We affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas, and we

remand this case to that court for further proceedings in accordance with law and this decision.

*Judgment affirmed in part and reversed in part; cause remanded.*

**TYACK and O'GRADY, JJ., concur.**

_____