[Cite as *Mueller v. All-Temp Refrig., Inc.*, 2014-Ohio-2718.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

SHIRLEY MUELLER, ET AL.,

    PLAINTIFFS-APPELLANTS,          CASE NO. 15-13-08

    v.

ALL TEMP REFRIGERATION,          O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Van Wert County Common Pleas Court

Trial Court No. CV 12-01-023

**Judgment Affirmed**

Date of Decision: June 23, 2014

APPEARANCES:

    *Todd D. Wolfrum*  for Appellants

    *Zachary D. Maisch*  for Appellee

**ROGERS, J.**

{¶1} Plaintiffs-Appellants, Stan ("Stan") and Shirley ("Shirley") Mueller (collectively, "the Muellers"), appeal the judgment of the Court of Common Pleas of Van Wert County dismissing their complaint in favor of Defendant-Appellee, All-Temp Refrigeration Inc. ("All-Temp"). On appeal, the Muellers contend that the trial court erred by: (1) not finding that an express warranty for future performance was created pursuant to R.C. 1302.26; (2) finding that the Muellers' contract with All-Temp was for a sale of goods; (3) not finding that the actions and representations of All-Temp created an express warranty; and (4) dismissing their claim for relief under the Consumer Sales Practices Act. For the reasons that follow, we affirm the trial court's judgment.

{¶2} On January 27, 2012, the Muellers filed a complaint against All-Temp seeking recovery for damages stemming from the unsuccessful installation of a geothermal system. The Muellers' complaint asserted four claims: (1) breach of warranty; (2) breach of contract; (3) violation of the Consumer Sales Practices Act; and (4) damages for emotional pain and suffering. Specifically, the first claim alleged that "Defendant had warranted through 'Exhibit A' and through several verbal representations to provide a functional geo thermal [sic] system and breached that agreement." (Docket No. 3, p. 2). The Muellers' second claim asserted that "Defendant did not supply a working system pursuant to their

contract and are in breach." (*Id.*). The Muellers attached All-Temp's contract to their complaint. It stated in relevant part:

> **PROPOSAL: CARRIER GEOTHERMAL SYSTEM FOR YOU [SIC] HOME**
>
> 50YCV048LEB301 Carrier 4-TON, High Efficiency Geothermal Packed Unit
>
> - ECM Variable Speed Motor
> - R-22 Refrigerant
> - 10-[Year] Refrigerant System Warranty
> - 5-Year Parts Warranty
> - 10-Year Labor Warranty
>
> * * *
>
> **Equipment, materials and labor to install:**
>
> **Cost: $10,032.00**
>
> **(1) 2000-Horizontal Closed Loop System Installed, Flushed, Warranted and Filled with Geothermal Solution by Buckeye Loop Masters.**
>
> **Cost: $3,875.00**
>
> **System Total: $13,907.00**

(Emphasis sic.) (Docket No. 3, Exhibit A, p. 1).

{¶3} All-Temp filed its answer on February 15, 2012, wherein it denied the allegations set forth in the Muellers' complaint and asserted numerous affirmative defenses, including statute of limitations. On April 19, 2012, the Muellers filed an amended complaint to correct their address. On March 26, 2013, All-Temp,

with leave of court, filed an amended answer wherein it added the affirmative defense of failure to mitigate damages.

{¶4} This matter proceeded to trial on July 15, 2013, where the following relevant evidence was adduced.

{¶5} Shirley testified that in April of 2006, she and her husband, Stan, had moved into a log cabin they had built as a retirement home. After researching different types of heating systems, the Muellers decided they wanted to install a geothermal system. Sometime in late 2005 or early 2006, the Muellers contacted All-Temp to provide them with a quote for the geothermal system. Shirley testified that her nephew, Mike Kill, worked for All-Temp at the time and she gave him the blueprints to their home so he could size the geothermal system.

{¶6} The installation of the geothermal system occurred sometime in late winter or early spring of 2006. Shirley testified that the geothermal system worked fine throughout the summer of 2006, but she started noticing problems with it around Thanksgiving of 2006. According to Shirley, the auxiliary heat would come on when it was only 45 degrees outside. Shirley testified that she had conducted research on geothermal systems and "knew that this wasn't right." Trial Tr., p. 13. In an attempt to fix the geothermal unit, she called All-Temp who told her there might be a problem with the thermostat and subsequently replaced it. However, the new thermostat did not help, and Shirley often had to supplement

the geothermal system with the Muellers' gas fireplace in order to properly heat their home.

**{¶7}** Shirley made numerous phone calls to All-Temp but never received a satisfactory resolution. Therefore, Shirley stated that she contacted another company, Kogge Plumbing, Heating and A/C Inc. ("Kogge"), to look at their system in January of 2007. Shirley testified that a representative from Kogge told her "our home wasn't the problem, there [was] a lot of the duct work in the basement wasn't taped. They suspected that there was a problem with the loop and he also, at that time, installed a sensor on the outside of the house that hadn't been installed by All-Temp." *Id.* at p. 15. Shirley stated that the geothermal system continued to work improperly and she had to buy a kerosene heater to use during the 2006-2007 winter.

**{¶8}** Shirley testified that All-Temp made a suggestion to caulk the upstairs of their home. The Muellers "were trying to accommodate [All-Temp]. We were trying to do ever [sic], cooperate with them. We were trying to do everything that they asked us to do in order to work with them to get this system working and nothing worked." *Id.* at p. 20. In the summer of 2007, the geothermal system worked properly, except for "freezing up" on one occasion. *Id.*

**{¶9}** In the fall of 2007, the system once again failed to work. Shirley testified All-Temp and its loop contractor agreed to monitor pressure in their

geothermal loop. Every time the loop would be "re-pressurized" up to the correct pressure, Shirley stated that a couple of days later, the pressure would have fallen again. *Id.* at p. 21. Shirley then testified that she called Kogge again on December 5, 2007 when she realized "we weren't going to get any resolution from All-Temp." *Id.* at p. 22. After she made a phone call to Kogge, she called All-Temp and said "[w]e don't want any more dealings with you. Stay out of our business." *Id.* at p. 24. However, on January 2, 2008, a representative from Kogge called Shirley and told her that he would be speaking to Keith Pohlman, the owner of All-Temp. Shirley then explained the relationship between All-Temp and Kogge, "My understanding is that Randy Hemker, who is the equipment sales rep from Habegger calls on All-Temp and he calls on Kogge's [sic]. He supplies their equipment for them." *Id.* at 24.

{¶10} In January of 2008, a meeting was held at the Muellers' house with Pohlman, Hemker, the builder of the Muellers' log home, and their contractor. Shirley testified that at this meeting, they were supposed to have the results of a "blower door test"[1] but were never given the results. However, Pohlman had the results of the test and provided everyone at the meeting with copies of the results, which led Shirley to believe "that maybe he knew that we wouldn't have our copy So [sic] we couldn't prepare ahead of time." *Id.* at p. 26. Shirley testified that the

---

[1] A "blower door test" is used to determine air tightness in a building or home.

meeting was very "heated." *Id.* She confronted Pohlman and asked him whether he lied about giving her the test results before the meeting and Shirley testified that Pohlman replied " 'yes I lied but I had a good reason.' " *Id.* She further testified that he said "that [All-Temp] never intended to do a good blower door test. They just wanted to know if our house had air infiltration." *Id.* at p. 27. When Pohlman left that day, Shirley testified that he told her not to call him " 'until you can prove to me that your house can be heated.' " *Id.* at p. 27.

{¶11} Throughout the summer of 2008, the geothermal unit worked without any problems. During the winter of 2008-2009, the geothermal system, once again, became problematic. Shirley placed another call to Kogge, but it was uninterested in trying to help the Muellers with their geothermal system.

{¶12} The Muellers waited another year, until the winter of 2009-2010, to contact another local contractor, Starks Plumbing and Heating ("Starks"), who inspected the Muellers' house and their geothermal system. Starks recommended that Shirley install a new geothermal unit. Shirley accepted Starks' quote and it installed the new system, which cost around $20,000. Shirley testified that the new system "worked fine. It worked great. Just as we had always expected a geothermal system to work." *Id.* at 30. The Muellers no longer needed to use their gas fireplace or kerosene to heat their house. However, Shirley said that she

did not notice a reduction in their electric bills after the installation of the new geothermal system.

{¶13} Shirley also testified that she believed that there was a warranty for the geothermal system she bought from All-Temp.

{¶14} On cross-examination Shirley stated that her main contact at All-Temp was her nephew. She testified that she supplied Kill with blueprints of their home and that was all the information he was given to prepare his bid for the project. While constructing their home, the Muellers requested quotes from other HVAC companies, but ultimately selected All-Temp's quote. Shirley testified the reason she went with All-Temp was because her nephew worked there. Shirley also had the following relevant exchange:

> Q: Did Mr. Kill make any statements about how the system was to perform?
>
> A: No.
>
> Q: Did he make any statements after it was installed, how it was intended to perform?
>
> A: No.

*Id.* at p. 37.

{¶15} Shirley then testified that she has had three blower door tests performed on her house. Further, she admitted that it was represented to her that her house was a "loose house" which meant that there was a high level of air

infiltration. *Id*. at p. 44. Shirley also stated that when All-Temp first sized her home, she was given the option of picking a three-and-one-half-ton system or a four-ton system. Shirley stated that she was referred to Starks by her son-in-law, Steve Jones.

{¶16} Glen Bowen was the next witness to testify for the Muellers. Bowen stated that he is the manager of technical education for Bard Manufacturing. As part of his job, he trains contractors on how to install heating, ventilating and air conditioning products, geothermal products, and oil furnaces. Bowen testified that he has had 14 years of experience with geothermal systems. Without objection from All-Temp, Bowen was accepted as an expert witness.

{¶17} Bowen testified that he met the Muellers in the summer of 2009 when he was working at Starks. According to Bowen, the Muellers "had a newer residence with an existing geothermal unit also recently installed that was not keeping up to their satisfaction. They were complaining about high energy bills and after two years of working with the existing contractor, no progress had been made and they were looking to find an answer to their problems." *Id.* at p. 55. After the Muellers contacted Starks, Bowen did an audit of the house. Bowen explained what he does when he performs an audit of a house:

> Where I walk in, free and clear of any preconceptions and look at the existing equipment, how it's been installed, duct work, loop field, whatever information they may have on hand. I measure up the house. Ask for blueprints and that's a preliminary meeting. From

that point forward then, I take all this information back to the office and roll it through some calculations to come up with my own idea on what it would take to heat and cool this building if we were to do the project. What I would have done personally. Anything that I might find wrong, that type of thing.

*Id.* at p. 55-56.

**{¶18}** Upon his inspection of All-Temp's geothermal unit, Bowen concluded that it was "installed in a very workmanlike fashion. It was done very well." *Id.* at p. 56. However, in Bowen's opinion, the four-ton system "was undersized by a fair margin and would not keep up regardless of how it was installed." *Id.* at p. 57. Further, Bowen testified that there was a leak in the duct work and that the duct work was oversized. Bowen stated that "[i]t was basically a catastrophic failure, one after the other after the other. Everything was building up to what was going to be a complete redesign, reinstallation." *Id.* Bowen also stated that All-Temp's geothermal unit could never have heated the Muellers' home properly. Further, Bowen stated that there was nothing the Muellers could have done with All-Temp's equipment to mitigate their damages. Therefore, Bowen recommended that the Muellers remove the four-ton unit and install a new six-ton geothermal system.

**{¶19}** The Muellers agreed to install the six-ton geothermal system and Bowen was unaware of any problems with the new system. Bowen also testified that the Muellers

-10-

were very frustrated for having two (2) years of no answers and some things that were put forward that maybe weren't the best ideas. They were certainly frustrated and they wanted to implement a solution before the coming winter. They were tired of Five Hundred (500) or Six Hundred (600) Dollar electric bills. They wanted something done.

*Id.* at p. 64-65.

**{¶20}** Bowen testified that he did not think it was necessary to implement a blower door test because he knew right away the problem was with the sizing of the unit. Further, Bowen stated that in his experience "often times with undersized equipment, a lot of things like blower door tests are throw[n] out to muddy the waters." *Id.* at p. 68-69.

**{¶21}** On cross-examination Bowen admitted that he worked for the company who ultimately sold the Muellers the new system and that his company benefitted by selling the newer, larger geothermal system. Bowen also had the following relevant exchange:

> Q: Since you have experience with loops, if you're out, if your loop in the ground is for a four (4) ton size, is it possible to just add additional pipe to make it operational with a six (6) ton in size?
>
> A: Yes it is.
>
> * * *
>
> Q: Now you mentioned that the four (4) ton system there was installed very well. In fact, I think you said it was in a workman . . ., the install was done very well and was in a workmanlike manner, correct?

A: That is correct.

Q: Did you ever test what that existing system was putting out?

A: Yes, actually, we did. I know that the technicians at the time tested the system to see where it was at, especially once I realized that there was a bypass issue in the duct work. I definitely wanted it tested.

Q: Was the installed system working properly in accordance with manufacturer's specifications?

A: To my knowledge, according to the technicians, yes.

Q: Do you believe the four (4) ton system that was installed was fit for the purpose for which it was installed, the entire system?

A: For the home?

Q: Yes.

A: No.

*Id.* at p. 78-79.

{¶22} Randy Mueller ("Randy"), the Muellers' son, then testified. He stated that he was present for a meeting between the Muellers and All-Temp in the winter of 2006 when the geothermal system began to work improperly. He testified that Pohlman told the Muellers that nothing was wrong with the geothermal system. Instead, he blamed the problem on the Muellers' house. The next winter, in 2007, Randy testified that All-Temp wanted to do a blower door test on his parents' house. However, Randy and the Muellers were never provided the results of the blower door test.

**{¶23}** When asked whether the Muellers took action in an attempt to correct the home based on what they had been told by Pohlman, Randy replied:

A:   Yes, we done [sic] a few things.

Q:   What were those things?

A:   We foamed up some corners.  We framed up and insulated a basement wall, a west wall in the basement.  The contractor came out that built the house and done some checking for insulation up in the bonus room area, if I remember correctly.  I think that's about it.

Q:   Did any of these things fix the problem?

A:   No.

*Id.* at p. 96-97.

**{¶24}** On cross-examination, Randy admitted that he does not know anything about the situation regarding the All-Temp geothermal system other than what the Muellers and Bowen have told him.   Randy was also confronted with an email he had written on June 22, 2011, about two years after Starks replaced the geothermal system.  The email states:

Keith [Pohlman],

You haven't returned my calls or emails which is very dis-appointing [sic].  I'm sorry you've chosen to do business this way but feel I've done what I can to try and communicate with you.

My next step will be to utilize all the social net-working tools I have at my disposal including Twitter, MySpace, Email and Facebook until we get resolution from [All-Temp].

> You owe my parents the entire cost of your install (approximately $15,000). As you probably are aware they had to have a properly sized unit including loop and ductwork put in by Starks in Paulding Oh. Since then, the power bills have been reduced by as much as 400%. Clearly your company did not live up to your end of the deal with this situation.

(Defendant's Exhibit P, p. 1). Randy testified that he did this to help get his parents' money back without having to go through litigation. Randy also testified that Pohlman came to his office at work once and told Randy that until he could prove that the Muellers' house could be heated, to not call him again. However, Randy also testified that Pohlman offered to take out the geothermal system and replace it with a propane system.

{¶25} The Muellers then called Pohlman and questioned him as if he were on cross-examination. Pohlman testified that he is the owner of All-Temp. Pohlman stated that the geothermal system he sold the Muellers comes with a 10-year refrigerant system warranty, a five-year parts warranty, and a 10-year labor warranty. Pohlman explained that the warranties are supplied by the manufacturer, not All-Temp.

{¶26} Pohlman denied telling Shirley not to call him until she could prove that her house could be heated. Pohlman also testified that the Muellers had complaints about the system but he could not solve their complaints because "there was nothing wrong with the system, number one, the geo and the electric heat would heat the home. I was never in the home when it was not up to

temperature. The equipment would do the job if it was left to do the job." *Id.* at p. 123. Pohlman also testified that there was nothing wrong with the size of the geothermal system. When asked why he offered Randy to replace the geothermal system with a propane system he replied:

> Because they didn't like our system. They wanted something else, so I said, whatever I need to do, I'll do. If you want a gas system, I'll put in a brand new one. I believe that's what I said. A new gas furnace and a new air conditioner, if that's what you would like. I strived [sic] to make sure that sure that all of our customers are happy. This is the first time I've been in a courtroom on any of my customers in forty (40) years.

*Id.* at p. 126.

{¶27} Further, Pohlman testified that he only stopped servicing the Muellers' geothermal system when he was told "not to step foot back in the house." *Id.* at p. 127.

{¶28} The Muellers then rested and All-Temp moved for judgment of dismissal pursuant to Civ.R. 41(B)(2). The trial court granted All-Temp's motion on counts two, three, and four. As to count one, the trial court found that the four-year statute of limitations found in R.C. 1302.98 applied, however, the trial court stayed the proceedings so both parties could brief the issue of when that statute of limitations began. Subsequently, both parties filed their respective briefs.

{¶29} On October 11, 2013, the trial court found that the "discovery rule has no application in a breach of contract for the sale of goods." (Docket No. 59,

p. 1). Thus, the statute of limitations began to run when the tender of goods was made in April of 2006. As such, the latest date that the Muellers could have filed their complaint under R.C. Chapter 1302 was April of 2010. The trial court found that even if the discovery rule was applicable, the Muellers admitted at trial that they knew that there was a problem with the geothermal system around November of 2006. Therefore, the trial court granted All-Temp's motion to dismiss count one.

{¶30} The Muellers filed this timely appeal, presenting the following assignments of error for our review.

*Assignment of Error No. I*

**FOR PURPOSES OF THE STATUTE OF LIMITIATIONS, THE COURT COMMITTED ERROR IN NOT FINDING AN EXPRESS WARRANTY TO FUTURE PERFORMANCE CREATED UNDER R.C. 1302.26.**

*Assignment of Error No. II*

**THE COURT COMMITTED ERROR IN NOT FINDING THAT THE PLAINTIFFS' CONTRACT WITH DEFENDANT WAS FOR THE INSTALLATION OF A GEO-THERMAL SYSTEM AND NOT FOR THE SALE OF GOODS, THUS CREATING DIFFERENT STATUTE OF LIMITATIONS REQUIREMENTS.**

*Assignment of Error No. III*

**THE COURT COMMITTED ERROR IN THAT THE ACTIONS AND REPRESENTATIONS MADE BY DEFENDANT HEREIN CREATED AN EXPRESS**

**WARRANTY UNDER THE LAW EXTENDING DIRECTLY FROM DEFENDANT TO PLAINTIFFS.**

*Assignment of Error No. IV*

**THE COURT COMMITTED ERROR IN DISMISSING PLAINTIFF'S CLAIM FOR RELIEF UNDER THE CONSUMER SALES PRACTICES ACT.**

**{¶31}** Due to the nature of the assignments of error, we elect to address them out of order and address the first and third assignments of error together.

*Assignment of Error No. II*

**{¶32}** In their second assignment of error, the Muellers argue that the trial court erred in finding that their contract with All-Temp was for the sale of goods. We disagree.

**{¶33}** Although the Muellers assert that the trial court erred in finding that their contract concerned the sale of goods, they do not tell this court how to instead interpret the contract. They only ambiguously argue "[a]lthough the contract to install an appropriate geo thermal [sic] system involved the installation of goods, these goods were not the subject of that bargain." Appellant's Br., p. 9. However, they never tell us what the "subject of that bargain" is, only that the Muellers "had a contract with Defendant to provide an appropriate geo thermal [sic] system." *Id.* Although their argument is somewhat confusing, it appears that the Muellers are attempting to argue that the contract in question was a contract for services, not goods.

R.C. 1302.01(A)(8) states:

"Goods" means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities, and things in action. "Goods" also includes the unborn young of animals and growing crops and other identified things attached to realty as described in section 1302.03 of the Revised Code.

**{¶34}** An action for breach of contract for the sale of goods "must be commenced within four years after that cause of action had accrued." R.C. 1302.98(A). "Sales of services are not covered by R.C. Chapter 1302." *Urban Industries of Ohio, Inc. v. Tectum, Inc.*, 81 Ohio App.3d 768, 773 (3d Dist.1992). Therefore, when a contract involves both the transaction of goods and services the predominant factor test is used to determine whether R.C. Chapter 1302 is applicable. *Id.*, at 773-774. Under the predominant fact test:

[T]he test for the inclusion in or the exclusion from sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved.

*Allied Indus. Serv. Corp. v. Kasle Iron & Metals, Inc.*, 62 Ohio App.2d 144, 147 (6th Dist.1977). Put more simply, the question is whether "the purchaser's ultimate goal is to acquire a product or procure a service." *Mecanique C.N.C., Inc. v. Durr Environmental, Inc.*, 304 F.Supp.2d 971, 977 (S.D.Ohio 2004).

**{¶35}** Whether a contract is for the sale of goods or services is a factual question and can be "determined by a review of the contractual language and the

-18-

circumstances surrounding the contract formation and expected performance." *Renaissance Technologies, Inc. v. Speaker Components, Inc.*, 9th Dist. Summit No. 21183, 2003-Ohio-98, ¶ 5. Therefore, a reviewing court may not reverse factual findings of the trial court as long as there is some competent, credible evidence to support the trial court's findings. *Id.* at ¶ 6.

**{¶36}** In the case sub judice, the trial court found that the Muellers' contract with All-Temp was for the sale of goods and that the applicable four-year statute of limitations applied. Upon review of the record, we find that there was some competent, credible evidence to support the trial court's finding. All-Temp's compensation was tied to the goods it produced rather than the labor it provided. The contract stated that All-Temp would provide a "50YCV048LEB301 Carrier 4-TON, High Efficiency Geothermal Packed Unit." (Docket No. 3, Exhibit A, p. 1). There is no mention in the contract of any services to be provided by All-Temp, except for the basic installation of the unit. Further, there was no separate price for installation. More compelling, the contract did not state that after the geothermal system was installed All-Temp would provide ongoing services or testing of the system. Therefore, the services of picking out and installing the geothermal unit was incidental to the Muellers' predominate purpose in acquiring a good. *See Mecanique*, at 977 ("The mere fact

that a manufacturer utilizes its efforts and expertise in producing a good does not mean that the buyer is purchasing those services instead of the good itself.").

**{¶37}** Accordingly, we overrule the Muellers' second assignment of error.

*Assignments of Error Nos. I & III*

**{¶38}** In their first and third assignments of error, the Muellers argue that the trial court erred in not finding that an express warranty for future performance was created pursuant to R.C. 1302.26. It also argues that the actions and representations made by All-Temp created a separate express warranty. We disagree.

*Standard of Review*

**{¶39}** A motion to dismiss that is made pursuant to Civ.R. 41(B)(2) enables the trial court to weigh the evidence and issue a judgment. *Rohr v. Schafer*, 10th Dist. Franklin No. 00AP-1059, 2001 WL 721865, *1 (Jun. 28, 2001). Under Civ.R. 41(B)(2), a trial court may consider "both the law and the facts." *Ohio Valley Associated Bldrs. & Constrs. v. Rapier Elec., Inc.*, 12th Dist. Butler Nos. CA2013-07-110, CA2013-07-121, 2014-Ohio-1477, ¶ 23. " 'The premise behind the rule is if the court in a bench trial disbelieves the plaintiff's facts or disagrees with the plaintiff's urged application of the law, then there is no reason to hear the defendant's case.' " *Id.* at ¶ 22, quoting *Martin v. Lake Mohawk Property Owner's Assn.*, 7th Dist. Carroll No. 04 CA 815, 2005-Ohio-7062, ¶ 19. When reviewing a

dismissal pursuant to Civ.R. 41(B)(2), matters concerning the credibility of witnesses are left to the sound discretion of the trial court. *Schafer* at *2.

{¶40} Further, a court does not have to review "the evidence in the light most favorable to the plaintiff but is required only to determine whether the plaintiff has made out his case by a preponderance of the evidence." *Jacobs v. Bd. of Cty. Com'rs of Auglaize Cty.*, 27 Ohio App.2d 63, 65 (3d Dist.1971). Therefore, this court may set aside a dismissal pursuant to Civ.R. 41(B)(2) only if it is erroneous as a matter of law or against the manifest weight of the evidence. *Id.*

*Express Warranty for Future Performance*

{¶41} On appeal, the Muellers argue that the trial court erred in not finding that an express warranty for future performance was created under R.C. 1302.26. Specifically, the Muellers contend they relied on All-Temp's experience and knowledge to pick out a correctly sized geothermal system, and thus, it "was clearly an assumed part of the bargain that [All-Temp] would be providing an appropriate system for the home." Appellant's Br., p. 5. They argue that the statute of limitations did not begin to run until the Muellers were placed on notice that All-Temp breached its warranty. The Muellers contend that the cognizable event happened in 2009, when they were informed by the Starks that their geothermal system was undersized.

{¶42} In contrast, All-Temp argues that the Muellers did not present evidence at trial regarding the breach of an express warranty, and thus, are barred from raising this issue for the first time on appeal. However, we find that the Muellers' first claim in their complaint alleged that All-Temp had breached warranties that were made through verbal representations and through their written contract. Additionally, both parties addressed the allegation of breach of warranty in their opening statements. Trial Tr., p. 3, 9. The Muellers further presented two witnesses, Shirley and Pohlman, who both testified as to the express warranties contained in the contract between the Muellers and All-Temp. As such, we cannot say that the Muellers are barred from raising this issue on appeal and will proceed to the merits of their first and third assignments of error.

Pursuant to R.C. 1302.98(B):

A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, *except that where a warranty explicitly extends to future performance* of the goods and discovery of the breach must await the time of such performance, the cause of action accrues when the breach is or should have been discovered.

(Emphasis added.) Further, R.C. 1302.26 states, in relevant part:

(A) Express warranties by the seller are created as follows:

(1) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

\* \* \*

(B)  It is not necessary to the creation of an express warranty that the seller use formal words such as "warrant" or "guarantee" or that he have a specific intention to make a warranty, but an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty.

{¶43} The "basis of the bargain" test found in R.C. 1302.26(A) focuses on whether the description or affirmation goes towards the "heart of the basic assumption between the parties." *Barksdale v. Van's Auto Sales, Inc.*, 62 Ohio App.3d 724, 728 (8th Dist.1989).  For example, "a seller's awareness of the customer's needs and affirmation that the product will meet those needs are sufficient to create an express warranty." *Bobb Forest Products, Inc. v. Morbark Industries, Inc.*, 151 Ohio App.3d 63, 2002-Ohio-5370, ¶ 49 (7th Dist.), *see also Boyas Excavating, Inc. v. Powerscreen of Ohio, Inc.*, 139 Ohio App.3d 201 (8th Dist.2000) (seller's representation that machine was capable of processing a 4,000 pound rock but failed to fulfill that purpose was sufficient to support excavating company's claim for breach of express warranty); *Brinegar v. Krabach*, 2d Dist. Clark No. 95 CA 30, 1996 WL 339942 (statement regarding the abilities of the product may create an express warranty); *Barksdale* (statement that car had recently been overhauled and was in good shape and that nothing was wrong with the transmission, may create an express warranty).

**{¶44}** In their discussion of their first assignment of error, the Muellers do not point to any specific statement or representation All-Temp made that created an express warranty for future performance. In fact, during Shirley's testimony, she admitted that Kill made no representations on how the system was expected to perform. Trial Tr., p. 37. Instead, the Muellers argue that it was "*an assumed* part of the bargain that [All-Temp] would be providing an appropriate system for the home[,]" and that "by operation of the bargain of sale * * * the implied warranty becomes an express warranty * * *." Appellant's Br., p. 5-6.

**{¶45}** We are unable to follow the Muellers' reasoning that an express warranty for future performance was created by something that was *assumed* by the parties. The Muellers are also unable to point to any case law which states that an implied warranty can create an express warranty. By its very definition "express" means "[c]learly and unmistakably communicated; directly stated," Black's Law Dictionary (9th Ed.2010), while "implied" means "[n]ot directly expressed; recognized by law as existing inferentially," *id.* Since the words "express" and "implied" are antonyms, we are unable to understand how an implied warranty created an express warranty for future performance. Since the Muellers failed to present any evidence that an express warranty for future performance was created, we need not determine when the cognizable event

happened. Instead, the statute of limitations began to run once the system was delivered and installed in the spring of 2006.

*Express Warranties in Contract*

**{¶46}** The Muellers also argue that All-Temp breached its 10-year refrigerant warranty and 5-year parts warranty.[2] Specifically, the Muellers contend that All-Temp breached these warranties because "the loop installed in the ground not only leaked, but that the leak would have been unfixable without exhuming the loop." Appellant's Br., p. 10. However, the contract explicitly stated that the "2000-Horiztonal Closed Loop System, Installed, Flushed, *Warranted*, and Filled with Geothermal Solution *by Buckeye Loop Masters*." (Emphasis added.) (Docket No. 3, Exhibit A, p. 1). According to the Muellers' expert witness, besides the loop, the rest of the geothermal unit was installed in a workmanlike manner and was working in accordance to manufacturer's specifications. Trial Tr., p. 78-79. Therefore, we cannot find that All-Temp breached any express warranty it outlined in its contract. The only warranty that the Muellers argue was breached was the warranty supplied by Buckeye Loop Masters, which was never made a party to this matter.

**{¶47}** Accordingly, we overrule the Muellers' first and third assignments of error.

---

[2] While Pohlman testified that these warranties were supplied by the manufacturer, not All-Temp, he admitted that it was reasonable for the Muellers to assume that All-Temp provided these warranties.

*Assignment of Error No. IV*

**{¶48}** In their fourth assignment of error, the Muellers contend that the trial court erred in dismissing their claim for relief under the Consumer Sales Practices Act. Specifically, the Muellers argue that All-Temp lied about "an important test" and that it "interfered when [Shirley] tried to contact another company to fix the system." Appellant's Br., p. 10. We disagree.

**{¶49}** The Muellers allege that All-Temp engaged in unfair or deceptive acts or practices in violation of R.C. 1345.02. Pursuant to R.C. 1345.02(A) a supplier may not "commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." R.C. 1345.02(B) gives a non-exhaustive list of deceptive acts:

> (1) That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have;
> (2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not;
> (3) The subject of a consumer transaction is new, or unused, if it is not;
> (4) That the subject of a consumer transaction is available to the consumer for a reason that does not exist;
> (5) That the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not * * *;
> (6) That the subject of a consumer transaction will be supplied in greater quantity than the supplier intends;
> (7) That replacement or repair is needed, if it is not;
> (8) That a specific price advantage exists, if it does not;

(9) That the supplier has a sponsorship, approval, or affiliation that the supplier does not have;

(10) That the consumer transaction involves or does not involve a warranty, a disclaimer of warranties or other rights, remedies, or obligations if the representation is false.

R.C. 1325.02(B)(1)-(10).

**{¶50}** Here, the Muellers do not argue that All-Temp engaged in a deceptive act outlined in R.C. 1345.02(B)(1)-(10), but instead, contend that All-Temp was deceptive when it lied about its intention of performing a blower door test and when it interfered with their ability to fix the geothermal system.[3]

**{¶51}** While Shirley did testify that Pohlman had allegedly told her that he had lied about performing a blower door test, she also testified that he did, in fact, perform the blower door test and gave her the results to that test at their January 2008 meeting. Further, we cannot find any evidence in the record that Pohlman interfered with the Muellers' efforts to fix the geothermal unit. While the Muellers assert that Pohlman interfered when they called Kogge about the geothermal system, Shirley admitted that it was Kogge who called Pohlman, not the other way around. Moreover, Pohlman testified that he stopped having contact

---

[3] The Muellers also argue that "[w]ithout further testimony, the court errored [sic] in dismissing Count Three of Plaintiffs' Complaint under the facts as presented." Appellant's Br., p. 11. We are unsure of what this means, but would remind the Muellers' counsel that the plaintiffs had the burden of presenting sufficient evidence by the close of their case-in-chief. The failure to provide adequate evidence to demonstrate a violation of the Consumers Sales Practices Act is an error that lies with the plaintiff, and not the trial court. *See* Civ.R. 41(B)(2); *Jacobs v. Bd. of Cty. Com'rs of Auglaize Cty*, 27 Ohio App.2d 63, 65 (3d Dist.1971) ("[T]he court, in a non-jury case, on a motion for involuntary dismissal, * * * is required only to determine whether *the plaintiff* has made out his case by a preponderance of the evidence.").

with the Muellers when he was told by them, "not to step foot back in the[ir] house." Trial Tr., p. 127. Besides Shirley's testimony, which evidently the trial court found incredible, there is no other evidence in the record to demonstrate that All-Temp was interfering in the Muellers' ability to fix the geothermal unit.

**{¶52}** Accordingly, we overrule the Muellers' fourth assignment of error.

**{¶53}** Having found no error prejudicial to the Muellers in the particulars assigned and argued, we affirm the trial court's judgment.

*Judgment Affirmed*

**WILLAMOWSKI, P.J. and PRESTON, J., concur.**

**/jlr**